No. 37,024

In the Matter of the Estate of Lizzie S. Wert, Deceased. MILDRED WERT, *Appellant,* v. W. S. PHILLIPS, Administrator, *Appellee.*

No. 37,023

In the Matter of the Estate of Lizzie S. Wert, Deceased. MILDRED WERT, *Appellant,* v. KENNETH J. WERT, and W. S. PHILLIPS, Guardian of the Person and Estate of Kenneth J. Wert, Incompetent, *Appellees.*

(193 P. 2d 253)

Opinion filed May 8, 1948.

*Earl Bohannon,* of Parsons, argued the cause, and *Elmer W. Columbia, John B. Markham, Herman W. Smith, Jr.,* and *J. Logan Shuss,* all of Parsons, were with him on the briefs for the appellant.

*A. L. Foster,* of Parsons, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

BURCH, J.: The principal question involved in these appeals is whether an alleged oral contract with deceased parties was established by evidence which should have been regarded as clear and satisfactory as a matter of law. The trial court ruled that the evidence was insufficient to support any contract. The appellant contends that such court either decided the case upon an incorrect conception of the law or acted arbitrarily in refusing to follow all of the adequate competent evidence introduced.

The two cases were consolidated for trial and also upon appeal. No controversy develops as to the propriety of the consolidation but by way of general explanation, the following facts should be stated. J. E. Wert and his wife, Lizzie Wert, had a son named Calvin Wert and another son named Kenneth Wert. Calvin Wert married the appellant, Mildred Wert, in June, 1924, and they lived together as husband and wife until Calvin Wert died on November 27, 1926, as a result of injuries he received in an accident while hunting. He left surviving him as his sole and only heir the appellant, Mildred Wert. The appellant asserts that on the day before Calvin's death, an oral contract was entered into between Calvin's parents and the appellant, which contract, in substance, provided that the appellant should receive the share of Calvin Wert in the estate which his parents owned in the event of Calvin's death prior to the death of his parents upon the condition that the appellant would remain single until the death of both parents and would continue to treat them with the same respect and render the same service to them which she had given to them during the time she had been the wife of Calvin Wert. The parties agree that J. E. Wert died on November 21, 1936, leaving a will which he had executed in February, 1927, and which contained provisions that were clearly contrary to the alleged oral agreement. His will was admitted to probate and the administration of his estate was closed. The appellant did not assert any claim against the estate of J. E. Wert because, according to her contention, she was not entitled to any part of the assets of

his estate until after the death of Lizzie Wert also occurred. Lizzie Wert lived until December, 1944, at which time she died intestate. The appellant filed a claim against her estate based upon the alleged contract between the appellant and the deceased parents of her deceased husband, Calvin Wert. The claim was denied by the probate court and appeal followed to the district court. The case which was appealed from the probate court to the district court is action No. 37,024 in this court. W. S. Phillips is the administrator of the estate of Lizzie Wert. Kenneth Wert, the other son of the parents, became incompetent and on February 4, 1929, the same W. S. Phillips was appointed guardian of the person and the estate of Kenneth Wert. As a consequence, after the death of Lizzie Wert the appellant brought an action in the district court, based upon the same alleged oral contract, against Kenneth Wert and W. S. Phillips as his guardian. Such action is appeal No. 37,023 in this court. Upon the consolidated trials of the two cases, the same evidence was introduced in support of both cases. Upon appeal, the same questions arise in both cases and for practical purposes they may be regarded as one case. As before stated, the appellant contends that her right to recover was established by clear and convincing evidence, and that the trial court either decided the cases upon an incorrect theory of law or acted arbitrarily and capriciously in holding contrary to all of the competent evidence introduced in the cases. In order to consider such contention upon its merits, we necessarily must review all of the evidence in the cases which is germane to the problem presented.

The appellant was disqualified from testifying in her own behalf in regard to any conversations she had with the deceased parties, under our statute G. S. 1935, 60-2804. Her sister, Cora McDaniel, testified that she was present in the hospital on November 26, 1926, at the time a bedside conversation arose among Calvin Wert, Mr. and Mrs. J. E. Wert and the appellant, and heard Calvin say to his mother and father, "If anything happens to me you will leave her my share of the estate when you are through with it?" and that Mrs. Wert said, "Yes, son, but nothing will happen to you," and Calvin said, "I don't know." Thereafter Mrs. Wert said, "Calvin, if Mildred is still our daughter-in-law as long as we live, and she remains single, and if Mildred still remains our daughter-in-law, we will promise you we will leave her your part of the estate when we are through with it." Whereupon Calvin turned

to his wife and said, "Mildred, they have promised, Dad and Mother have promised to leave you my share of the estate. Will you promise them that you will never remarry as long as they are alive, if they promise they will leave you my share of the estate, if you will stay unmarried?" In answer to the question, Mildred said, "I promise." The witness further testified that Mr. and Mrs. Wert both said, " 'If she is as good in the future as she has been in the past' they would leave his [Calvin's] share of the estate to her later on." Calvin died the next day. The witness also testified to many conversations she had with Mr. and Mrs. Wert after Calvin's death in which the deceased parties confirmed their agreement, but the corroborating conversations will be discussed later in the opinion. We note, in passing, that Cora McDaniel was testifying in behalf of her sister. Consequently, the trial court may have thought she was prejudiced and may not have given much, if any, weight to her testimony. It may be noted, also, that in cross-examination a transcript of the testimony the witness had given in the probate court was introduced, from which it is argued that in the probate court the witness testified to the effect that Mildred promised the parties at the bedside conversation she would "never remarry" instead of saying that she would not remarry as long as Mr. and Mrs. Wert lived. An explanation of the variance develops in the record but we do not consider that it requires elaboration for present purposes. If the testimony of Cora McDaniel were the only testimony as to the bedside conversation, this court would have no hesitancy in holding that the district court was not required to accept her testimony as sufficient evidence of the alleged contract. However, other witnesses to the conversation testified.

Lois Taggart testified that he was present in the hospital the night before Calvin died and heard a conversation among Calvin Wert, Mr. and Mrs. J. E. Wert and the appellant, in which Calvin asked his parents, "Well, if anything happens, will you leave Mildred my share of the estate if she doesn't remarry?" Mr. and Mrs. Wert said they would, and that thereupon Mildred said she would not remarry. Another witness, George W. Cuddy, also heard the bedside conversation. He testified that he knew Calvin Wert and learned of the hunting accident which caused his death, and that on the afternoon of the accident he heard that it might be necessary to give Calvin Wert a blood transfusion. As a consequence, he went to the hospital that evening and was present when a bedside

conversation occurred among the parties herein named. According to the witness, Calvin called his mother and father over to the bed and "he told his mother—well, his father was right there too, but he told his mother, he said, 'Mother, if anything happens to me I want you to tell me what you are going to do about Millie.' And she said, 'Everything is all right. Nothing is going to happen.' And he said, 'I know, but I want you to tell me.' And they said, 'I have told you before.' He said, 'No, I want you to tell me in front of Millie, you and dad both.' And he said—Mr. Wert said, 'We will take care of Millie regardless whatever happens to you, as long as she is our daughter-in-law.' And he said, 'That isn't what I mean.' He said, 'I mean, Dad, about my inheritance.' And Mrs. Wert said —or Calvin said, 'I want you to tell me in front of Millie about that.' And Mrs. Wert said, 'Well, I promise you that if anything should happen to you that your inheritance will go to Millie if she remains single as long as we live.' And he said 'What about you, dad?' And his dad said, 'I promise you that.' He said, 'Well, Millie, is that all right with you?' And she said, 'I certainly promise you I will remain single.' . . . I was standing off to one side, and I think there was two or three other fellows there, Roy McDaniels, and Taggart, and a fellow . . . [named] Fred Majors."

In relating the testimony of the three witnesses who testified as to the bedside conversations, it may be noted that we have refrained from setting forth many repetitions of the same or similar testimony which developed in connection with the direct, cross- and redirect examination of the respective witnesses. The appellee has filed a counter abstract in the case which has been given close scrutiny but it cannot be said from the record that the cross-examinations developed in this case any material conflict between the testimony given by the witnesses on direct examination and on cross-examination with the possible noted exception of the testimony given by Cora McDaniel. Moreover, nothing developed from the cross-examination of the various witnesses to the deathbed conversations which could be considered as making their testimony inherently improbable or uncandid. The appellee admits in his brief that there was no direct and positive testimony introduced in behalf of the appellee which refuted the making of the alleged contract. In explanation, the appellee calls our attention to the fact that Kenneth Wert was in the insane asylum and could not testify; that Mr. and Mrs. Wert were dead, and that any other witnesses

to the bedside conversations could not be located. It may be observed, also, that the witnesses were testifying to conversations which occurred over twenty years prior to the time the cases were tried. The appellant insists that consequently the witnesses to the alleged agreement were not required to testify as to the exact details of the oral agreement.

The corroborating evidence offered by the appellant is extensive. Cora McDaniel also testified that after Calvin died Mr. Wert told her that he had made a will in which he had divided the property equally between the two boys and that since Calvin had died he was going to change his will and divide his property equally between Kenneth and Mildred because he had promised Calvin that Mildred would get his share of the estate. The witness also testified to conversations she had with Mr. Wert at a gravel pit, in which he said that he had left a certain farm to Mildred and certain town property to Kenneth. The witness further testified that she overheard Mrs. Wert say to Mildred a short time before Mrs. Wert's death occurred that she had her will made in such manner that "I have left you Calvin's share as Dad and I agreed to before he died." In addition, the witness testified to other corroborating circumstances but more of her testimony will not be set forth because of the possibility that the trial court may have thought the witness prejudiced by reason of her relationship to the appellant. Many other witnesses testified. J. E. Dodson testified that J. E. Wert had told him in 1935, when the witness went out to the Wert farm to buy some hay; that Millie (the appellant) was going to be remembered after J. E. Wert died. Glen W. Jones testified that he rented a farm from J. E. Wert, and that in 1930 J. E. Wert told the witness that if Calvin's wife stayed a widow during J. E. Wert's lifetime he intended for her to have Calvin's part of the estate and that Mr. Wert had made similar statements to him on many occasions. Willis Yagel testified that he went to the Wert home in 1932 for the purpose of trying to rent or buy a farm; that he saw Mr. and Mrs. Wert and in the course of the conversation J. E. Wert said, "I have made a promise to that boy on his deathbed that his wife would inherit his share of the estate, so that I just don't feel that there is anything that we can sell you or feel like we should sell, because we are going to try to keep that estate together." On cross-examination, the witness testified that Mr. Wert had stated as follows:·

"He said the boy had asked his wife, on his deathbed, never to remarry, and that they had agreed to see that she was taken care of, or she would inherit his part of his estate if she kept her part of the contract, and that they felt obligated that they should look after this girl, and that that was the main reason they gave me in not wanting to sell or dispose of any of the property at that time."

The witness further testified that he and his wife, in 1940 or 1941, went to see Mrs. Wert for the purpose of trying to rent or buy a farm and that Mrs. Wert at such time said, "Well, it runs in my mind that you folks were here before" and they said, "That is right" and that she said, "Of course, you know Mr. Wert has passed on. I still can't, like I told you folks before, or Father Wert told you before, what we were going to do with our property and our stuff." And that Mrs. Wert also said, "That is a deathbed promise and we have just got to keep it that way, and I don't feel that I can turn loose of anything." Mrs. Willis Yagel also was called as a witness. She testified that she was with her husband when they had the conversation with Mr. and Mrs. Wert in 1932 about buying or renting one of their farms, and that Mr. Wert said, ". . . that everything was rented at that time, but they had felt they just couldn't sell anything on account that they had made an agreement, or promised their son that they wouldn't sell anything, and that they would take care of his wife, . . . They said they felt that they couldn't sell anything." The witness was asked the following question:

"Q. Now, in the conversation do you recall anything that was said about anybody remaining single?"

And answered:

"A. Well, Mrs. Wert said at that time that Millie was to remain single, and that Mr. and Mrs. Wert was intending to keep that promise they made before Calvin had died."

The witness was interrogated about a subsequent conversation and she was asked:

"Q. Will you tell the Court what was said at that time?

"A. Well, we went there and asked her if she had any farms to rent, or would sell the place on North Twenty-first, and she said it would be for rent, she thought, and that she would know that night, because the man was coming in then, but she wasn't going to sell any. She said that everything was going to be just like it was before, and that they had to take care of the daughter-in-law, their son's wife, and that they were going to give her his share of the estate."

Frank Campbell testified he had known Mr. and Mrs. Wert for

many years and that on one occasion Mr. Wert had told the witness that they (Mr. and Mrs. Wert) had promised Calvin that Mildred would get Calvin's share of their estate. His testimony reads as follows:

". . . I was talking with him [Mr. Wert] and he said Mildred had been so good to Mrs. Wert, he said she was so good to drive her back and forth whenever she wanted to go any place, and that she thought an awful lot of Mildred, and then the conversation went on about Mildred and he said that they promised Calvin when he passed away that Mildred would get Calvin's share of the estate."

The witness also testified that Mr. Wert on one occasion stated as follows:

"Well, after we die we agreed to leave Mildred Calvin's part of the estate. That was a deathbed promise."

The witness also testified that Mr. Wert said "as long as Mildred would stay single while they were alive she would get it." The witness further testified that he and his wife later had a conversation with Mr. and Mrs. Wert in regard to which the witness summarized as follows:

". . . Well, it was the same statement and Mildred's name was brought up and they said they had provided for Mildred if she would stay single, that she would never have to do anything in her life or during their life."

On cross-examination he testified:

"Q. Now, you are absolutely confident that they said—J. E. Wert, and Lizzie Wert, said that if Mildred was to get anything, it was only to be given to her if she had remained single?

"A. Yes, sir. She said that Mildred was going to get this if she remained single until they passed away. I have heard Lizzie say that; yes, sir.

"Q. You are positive that last part was put on it, 'Until they passed away'?

"A. Yes, sir, I have heard her say that.

"Q. I believe you testified you heard J. E. Wert say that, also?

"A. Yes, sir; when we went to Humboldt. Ed was a smart man. You know that, and Mr. Phillips knows that. I was asking him why he didn't retire."

I. C. Hurd testified that he had a conversation with J. E. Wert in 1934 or 1935 and that Mr. Wert told him if Millie's name was still Wert and she was as good in the future as she had been to him and his wife that she would share Calvin's part of the estate. Mrs. E. J. Dietsche testified that she had many conversations with Mrs. Wert and that Mrs. Wert told her ". . . That Mildred would be well taken care of when she died, that she had plenty and she wanted

Mildred to have her share of it, and when she mentioned Calvin's name, that Mildred was to get his share." The witness testified further: "She told me that as long as Mildred was single that they promised it to her and she wanted her to have it. She told me that several times in two years." Mrs. Abbie Ward testified that she had lived near Lizzie Wert for twenty-four years; that she was at the Wert home when Calvin was brought in from the hunting accident. The testimony of the witness reads: ". . . After Calvin's death I went over there and there was Mildred doing the work. Right away after Calvin's death, Mr. Wert said that he loved Mildred and thought so much of her, they both did, and they said she would get his part. There were two boys, Kenneth and Calvin, and, of course, Kenneth is in the asylum, and the other part was to go to Mildred. Mr. and Mrs. Wert both told me this."

The foregoing only partial testimony of eight corroborating witnesses, not including Cora McDaniel, was not, in our opinion, contradicted or weakened in any way by cross-examination. So far as the record discloses, the witnesses were candid and not prejudiced in any manner. And we are unable to find anything improbable about their testimony. Many, if not all, of the named witnesses testified as to plausible circumstances, which need not herein be set forth, which occasioned the conversations with Mr. and Mrs. Wert. Counsel for the appellee insists that many of the questions propounded to the witnesses were leading and suggestive, but we are of the opinion that any instances thereof did not affect the substance of the testimony given. The appellee did not introduce any substantial testimony which, in any way, contradicted the testimony given by the corroborating witnesses. No witnesses testified in behalf of the appellee to having conversations with either Mr. or Mrs. Wert in which either of such parties had stated anything contrary to the statements related by the appellant's corroborating witnesses. Counsel for the appellee devotes a section in its brief to a review of the appellee's evidence but fails to call our attention therein to any evidence which contradicts, in any manner, the testimony here-inbefore set forth of the corroborating witnesses. We have searched the record for any such evidence. The only fragment of evidence in the record which might be regarded as a possible contradiction of the corroborating evidence is the testimony of Samuel D. Wert to the effect that both Mr. and Mrs. Wert had told him that Mildred "was taken care of" or that she was "being taken care of."

Much of the testimony of the witness, in substance, corroborated the appellant's evidence. There is no evidence whatever to support a contention that the appellant was, in fact, taken care of by Mr. and Mrs. Wert in any way during their respective lifetimes, and counsel for the appellee does not so contend. The only explanation which arises from the record as to what may have been referred to in the testimony of the last-named witness is the testimony of other witnesses to the effect that either Mr. or Mrs. Wert, or both of them, may have at one time made a will or wills in which they devised or bequeathed property to the appellant. However, there is no evidence in the case which established that either Mr. or Mrs. Wert left such a will. The only admitted will is that of J. E. Wert which, by its terms, devised a life estate to Lizzie Wert, with power of disposition, and provided that any remainder should go to Kenneth Wert in the event he survived Lizzie Wert. Such will did not contain any provisions that could be considered as having "taken care of" the appellant. Because of the absence of any showing that the appellant was ever given anything, the testimony of Samuel D. Wert does not have substance which contradicts the testimony of the appellant's witnesses. And it may be noted that the quoted testimony of appellee's witness, Samuel D. Wert, by implication at least, indicates that Mr. and Mrs. Wert felt obligated to provide for the appellant in some manner. Moreover, there is no circumstantial evidence in the record of the present case which may be said to contradict the testimony hereinbefore set forth. The appellant testified that she had never remarried. There is no evidence to contradict such fact. She also testified that after her husband's death she had opportunities to marry while his parents were alive.

Much evidence was introduced pertaining to whether the appellant complied with her part of the alleged contract. She and many other witnesses testified that the appellant performed, after the death of her husband, Calvin, many unusual and exceptional services for Mr. and Mrs. Wert. According to the record, the appellant aided them in cleaning the house from time to time, took bedding out and washed it, cooked for them, aided them in business transactions, helped them get vegetables, delivered groceries and ice to them, assisted them when they were ill, helped them can fruit, drove them to various farms and on trips to Arkansas City, Wichita, Coffeyville, and Kansas City. Such services and other similar services were performed by the appellant in behalf of Mr. and Mrs. Wert

for a period extending over eighteen years according to the testimony favorable to the appellant. It should be noted that during most of such period, the appellant was not residing with Mr. and Mrs. Wert, and that there is no contention made in this case that a family relationship existed between Mr. and Mrs. Wert and their daughter-in-law, the appellant. Without reviewing the testimony as to performance further, we have no hesitancy in holding that abundant evidence was introduced to show substantial performance of the alleged contract, and that the circumstances are such that no inequity would prevail from its enforcement. It must be conceded, however, that some evidence was introduced which might be regarded as disproving compliance on the part of the appellant.

The evidence introduced by the appellee which might be considered as contradicting the appellant's evidence as to performance is in the nature of negative evidence. The first witness called in behalf of the appellee was Harrison L. Causey. He testified that he was a tenant on one of the Wert farms for about a year; that Mrs. Wert drove out in a car with another woman by the name of Wright on probably a dozen occasions and that he never saw Mildred Wert, the appellant, while he was out there. The same negative testimony, in substance, was given by Mary Causey, who was the wife of Harrison L. Causey. Other witnesses testified in behalf of the appellee to the effect that during certain intervals they had not seen the appellant performing any services for Mr. or Mrs. Wert. Testimony also was introduced that Mr. Wert was able to drive his own car until a short time before his death. Some of the appellee's witnesses admitted, on cross-examination, that they had seen the appellant giving aid to Mrs. Wert. We need not burden the record further in such regard because it may be conceded for our purposes that the record does present some negative evidence on the question whether the appellant substantially performed her part of the alleged contract. It is apparent from the record, however, that the district court gave very little consideration to the evidence which was introduced for the purpose of establishing performance. Counsel for the respective parties were unable to agree upon a journal entry covering the question of performance and after hearing argument, the court entered the following finding:

"The court finds, all things that are necessary and essential to support the judgment herein rendered, but the court having found that the alleged contract was not entered into, the court did not make any findings of either com-

pliance or noncompliance on the part of the petitioner with the alleged contract."

The court also recited in the signed journal entries the following:

". . . the petitioner, upon whom the burden of proof rests, did not establish the existence or the making of the alleged oral contract between Mildred Wert and J. E. Wert and Lizzie S. Wert, his wife, by competent evidence that was clear, convincing and satisfactory to the court and that by reason of such failure of proof, judgment should be rendered in favor of respondent and against petitioner for the cost of this case."

Appellant insists, upon appeal, that this court should overrule the district court on the evidence introduced in this case and order judgment entered in behalf of the appellant. The court cannot do so. Some conflict does appear from the evidence as to whether, under the terms of the alleged oral contract, the appellant agreed that she would never marry again in the event of her husband's death or whether she would not marry until after the death of both of her husband's parents. It is urged by the appellee that if the alleged contract was to the effect that the appellant would never marry, then such a contract was in violation of public policy and, therefore, not a valid consideration for her alleged promise to the parents of her husband. The question whether a contract in absolute restraint of marriage is against public policy is not squarely presented by this appeal because of the court's ruling that no contract whatever was established by clear and satisfactory evidence. Therefore, the validity of any alleged contract is not properly before this court for consideration and briefs upon the question have not been submitted by counsel for the respective parties. There is a possibility that our decision in the case of *Smith v. Nyburg,* 136 Kan. 572, 577, 16 P. 2d 493, might dispose of the question if the trial court had made a finding to the effect that the appellant agreed to remain single only until the death of both of her husband's parents, but we cannot reach decision on that question in the absence of a finding of fact on the conflicting evidence. This court also is unable to order judgment in behalf of the appellant because of the slight conflict in the evidence relative to performance on the part of the plaintiff and the absence of any finding of fact by the trial court on such evidence. One of the specifications of error in the cases, however, is that the trial court erred in overruling the appellant's motions for new trial. Such motions were argued and overruled in the two cases. The motions assert that the judgment and decision of the court in each

case was erroneous because it was contrary to the evidence and contrary to the law. The remaining question, therefore, is, does the record require a new trial?

The evidence in this case has been set forth at greater length than is customary because the record presents a problem which is unusual, if not unique. Before us we have an instance in which the trial court has made not only a negative finding, but in addition has done so in a controversy in which the standard of proof requires that a party must prove a case by evidence which is clear and convincing to the trial court. In such cases it is well established that the mere fact that certain evidence is uncontradicted does not require the trial court to make findings in accordance therewith. On review, this court may set aside an affirmative finding because the record shows that there was no evidence to support it but a negative finding is seldom set aside if the evidence is limited in quantity and its weight and credibility may be questionable or if the evidence may be regarded as unreliable for any reason. Usually it is held in cases of the present character that whether equity will decree specific performance of an asserted oral contract rests in judicial discretion and depends upon the facts and circumstances of the particular case. The rule is well recognized also that in cases of oral contracts asserted as a basis of a claim against the property of deceased parties, the contract must be definite, its enforcement equitable, and its performance must be established on the part of the promisee. Moreover, it is frequently required that the performance must be attributable to the alleged contract as distinguished from some other relationship. The appellee insists that the appellant has not met the standards above set forth and other standards of proof required in this class of cases and that, consequently, the judgment of the district court should be sustained. In support of such contention, the appellee relies principally upon the cases of *In re Estate of Johnson,* 155 Kan. 437, 125 P. 2d 352; *Potts v. McDonald,* 146 Kan. 366, 69 P. 2d 685, and *Woltz v. First Trust Co.,* 135 Kan. 253, 9 P. 2d 665, and earlier decisions of this court which are cited in such cases. The question develops whether the well-recognized law followed in the cited cases should control the instant case, or whether it presents an instance wherein the trial court has regarded the rule relative to clear and satisfactory evidence as being more rigid in its requirements than was ever intended by this court, or has acted

arbitrarily in disregarding all of the positive, convincing evidence in the record.

In the case of *Woltz v. First Trust Co.*, supra, the record clearly disclosed that the asserted contract was indefinite in its terms not only as to the property covered by the contract but in addition that its terms were not even clear to or understood by the alleged promisees. Moreover, it was held that the case presented an instance wherein it would be clearly inequitable for a court to turn over to parties property of the reasonable value of $75,000 in payment of services which could be readily estimated in money and which actually were worth only a few hundred dollars. The opinion concludes as follows:

"Taken as a whole, the record clearly shows that the claim of plaintiffs for all of Mrs. Schindler's property by reason of the alleged contract is not well founded and that it has no merits in equity." (p. 262.)

We are unable to hold in the present case that the appellant's cause is inequitable or that she could be properly compensated in money. (See *Smith v. Nyburg*, supra.) The record develops that she clearly understood the terms of the alleged contract. It follows that the Woltz case, *supra*, does not control the present controversy.

In the case of *Potts v. McDonald*, supra, the syllabus reads:

"The fact that certain evidence in an action for specific performance of an oral contract is uncontradicted does not require the trial court to make its findings in accordance therewith, *if there be other evidence in the case which may affect the weight and credibility of the same, . . .*" (Emphasis supplied.)

In the Potts case, *supra*, one witness, who was the father of the plaintiff, testified as to the terms of the alleged contract. The opinion develops the fact that the trial court may have held that such evidence was insufficient "because of the limited quantity of it, or because of its questionable weight and the credibility of it." The opinion concludes:

"But there was also quite a little evidence which differed widely from the testimony of witnesses for the plaintiff, so that the court could reasonably have doubted the force and effect of the plaintiff's evidence as to the making and terms of the alleged contract even if there was no evidence directly contradicting it." (p. 372.)

As we read the record in the present case, with the exception of the negative testimony pertaining to performance, there is no other evidence in the case which affects the weight and credibility of the

evidence produced in behalf of the appellant, and therefore *Potts v. McDonald,* supra, is not in all respects controlling.

The first syllabus in the case of *In re Estate of Johnson,* supra, reads as follows:

"A trial court cannot arbitrarily or capriciously refuse to consider the testimony of any witness, but it is not obliged to accept and give effect to evidence which, in its honest opinion, is unreliable, even though such evidence is uncontradicted."

The opinion, however, concludes:

"In passing, however, we may say there were various facts and circumstances in connection with the testimony offered in support of plaintiff's claim which would appear to have justified serious doubt, if not absolute disbelief, with respect to the justice of the claim. Defendant's testimony served to cast additional doubt upon various aspects of the claim. Manifestly we cannot disturb the judgment." (p. 440.)

We are unable to find in the instant case any facts or circumstances which appear to cast serious doubt upon the justice of the claim and, consequently, the Johnson case, *supra,* is not controlling.

The appellee contends that the judgment of the trial court in the present case was justified because the appellant's evidence did not clearly and convincingly establish the express provisions of the alleged oral contract. Perhaps the trial court was of the opinion that such an alleged contract must be established by evidence so precise and definite in its nature that no question could remain, even doubtful, as to any of the terms and provisions of the alleged contract. The rule relative to clear and convincing evidence and certainty in similar oral contracts does not extend to the point of requiring that each and all of the provisions of the oral contract must be proved beyond a reasonable doubt. If such a strict degree of proof were required, such contracts, even though meritorious, seldom could be established. In cases of the present character, the contracting parties cannot testify. The lips of the deceased parties are sealed by the silence of death, and the lips of the claimants are sealed by the statute. In such instances, the proof essential to the establishment of the alleged contract usually must come from others who are not parties to it and such third parties frequently cannot testify to each and every intricate detail of the alleged contract. The ability to establish clearly in detail each essential element is often affected by the lapse of time which occurs between the making of such agreements and the termination of the contractual periods. The perplexing problem as to production of adequate evidence in such cases

received the consideration of this court in the comparatively early case of *Griffith v. Robertson*, 73 Kan. 666, 85 Pac. 748, from which the following is quoted:

"It is not essential that a formal offer and acceptance, in writing or otherwise, be shown. In the absence of more direct evidence the *fact* may be established by circumstances. An express contract exists whenever there is a mutual meeting of the minds upon any contractual proposition." (p. 671.) (Emphasis supplied.)

In the case of *Johnson v. Lander*, 140 Kan. 329, 36 P. 2d 1006, syllabus 2 reads:

"In the proof of such a claim, the evidence may be direct or circumstantial. *The essential contractual proposition is that under an agreement they were to be compensated,* the claimants rendered the services contemplated by the parties, and had not been paid therefor, which is a question of fact to be determined by the court or jury upon competent evidence." (Emphasis supplied.)

As stated in *Johnson v. Lander*, supra, the rule has been applied in cases in which the agreed compensation was to be the property the decedent left.

An early and leading case upon the question of the sufficiency of evidence to establish the nature of the contract is that of *Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743, 9 L. R. A. (n. s.) 229, from which the following is quoted:

"The main contention of the defendants is that the evidence is not sufficient to warrant the finding that the contract was made or to show its exact terms. With respect to the character of evidence necessary in cases of this kind to warrant a court in decreeing specific performance the rule is that *the agreement* should be clearly and definitely established. We are satisfied with the language of the court in *Edson v. Parsons*, 155 N. Y. 555, 50 N. E. 265, as follows:

" 'But, equally, would it be the duty of a court of equity to refuse that relief, where the agreement sought to be given effect was not certain and definite. Clearly, it should hesitate to assume the grave responsibility of *implying an agreement,* whose existence depends upon circumstances, *inconclusive in their nature and permitting an inference either way.* It is not essential to the intervention of equity, in order to prevent the accomplishment of fraud, that *an agreement* should be established by direct evidence. *It may be established from such facts and circumstances as will raise an implication that it was made; and may have reinforcement from the evidence of the conduct of the parties, at the time and subsequently.*' (Page 567.)" (p. 127.) (Emphasis supplied.)

The opinion continues:

"While but one witness testified to the contents of the [lost] correspondence which made up the contract, *the fact that a contract existed,* and its terms as found by the court, are supported and reinforced by the *conduct* of all the parties." (p. 128.) (Emphasis supplied.)

See, also, *Smith v. Cameron,* 92 Kan. 652, 141 Pac. 596, 52 L. R. A., n. s., 1057; *Cathcart v. Myers,* 97 Kan. 727, 156 Pac. 751; *Jacks v. Masterson,* 99 Kan. 89, 160 Pac. 1002. A statement which is frequently quoted in our reports will be found in *Bichel v. Oliver,* 77 Kan. 696, 95 Pac. 396, and reads as follows:

"If the *facts* and *circumstances* brought out in the evidence, including the acts of the parties, are such as to raise a convincing implication that *the contract was actually made* and satisfy the court of its terms and performance, and that there would be no inequity in its enforcement, it is sufficient." (Syl. ¶ 3.) (Emphasis supplied.)

See, also, *Hickox v. Johnston,* 113 Kan. 99, 213 Pac. 1060, 27 A. L. R. 1322.

In nearly all of the cases cited and in many others the rule is recognized that the express terms of the contract in cases of similar character need not be established by direct evidence but that all of the circumstances may be considered, and further that performance is not only essential to recovery but is one of the circumstances which should be taken into consideration in determining whether a contract was entered into. In the present case, the record indicates that the trial court may have disregarded the evidence of performance. The trial court did not make a finding upon such question of fact because of the conclusion reached by such court that no contract whatever was clearly established by the direct evidence, corroborating testimony or by any of the circumstances.

From the foregoing it may be deduced that since all of the exact terms of similar oral contracts seldom can be proved except by limited direct evidence, the law, therefore, does not require that all of the specific provisions of such contracts must always be definitely established. The making of an agreement must be clearly and definitely developed by direct evidence or corroborating testimony or by circumstances from which the reasonable inference arises that an agreement was made. If, from all of the evidence, a reasonable implication may develop that an agreement was or was not made, the standard of proof is not met. Without agreements, the law in some cases may imply a promise to pay a reasonable sum for services or material furnished. But it does not follow that parties are entitled to be declared the owners of certain property in the absence of an actual agreement. Although it is self-evident and axiomatic, it may be stated that ordinarily specific performance of an agreement cannot be enforced in the absence of any agreement whatever.

Whenever it is once determined, from direct or other evidence, that a valid agreement was entered into between the parties, equity may specifically enforce its terms. If all of the terms of the agreement have not been defined in detail by the evidence, it does not follow that equity is helpless and must deny all relief and thus aid in the accomplishment of an unjust imposition. In such cases equity should enforce such provisions as appear to have been definitely agreed upon between the parties, if the provisions are not inequitable, and in connection therewith equitably determine the remaining essential rights of the parties in the exercise of the maxim that "Equity imputes an intention to fullfill an obligation" and other applicable principles of equity. (See 19 Am. Jur. 318; 30 C. J. S. 516.) Perhaps the trial court in the present cases was of the opinion that all of the exact provisions of the alleged original agreement had not been established by clear and convincing direct or other evidence and that, consequently, any agreement which might have been entered into by the parties could not be enforced. We cannot clearly read the reasoning of the court from the record. We can only conclude that the uncontradicted evidence was adequate in this case to establish, as a matter of law, that a contract of the general nature of that alleged was entered into. As before stated, the question whether it was complied with by the appellant must remain unanswered by this court. The question whether the trial court acted arbitrarily and capriciously in the cases requires further consideration by this court.

Arbitrary and capricious action has been given consideration recently by this court. Syllabus, paragraph 2 in the case of *Gibbs v. Central Surety & Ins. Corp.*, 163 Kan. 252, 181 P. 2d 498, reads as follows:

"Ordinarily the trier of the fact is not required to believe the testimony of any witness merely because there is no direct testimony to controvert it, but where plaintiff produces two witnesses who testify on every material element of plaintiff's cause of action, and such testimony is not inherently improbable or uncandid, and the cross-examination does not develop any conflict, and the defendant produces no testimony in opposition, the trier of the fact is not justified in arbitrarily or capriciously disregarding such testimony."

The opinion in the case reviews many of our cases upon the general subject as to when a court or jury is at liberty to disbelieve uncontradicted testimony, and we need not comment further upon them herein. It will be noted that in the last-cited case, a negative finding of fact which ignored uncontradicted testimony was set

aside and the judgment of the trial court was reversed. The case did not involve an oral contract claim against an estate or questions of clarity or sufficient performance under a contract which might otherwise have been void by reason of the statutes of fraud. But a trial court should not act arbitrarily in any kind of a case. As in the Gibbs case, *supra,* the testimony in the present case is not inherently improbable or uncandid and the cross-examination did not develop any conflict. In addition, it should be noted again that the defendant produced no testimony in opposition to the direct evidence of the contract or to the corroborating testimony or even as to circumstances with the exception of the negative evidence as to performance. Moreover, the record does not present any evidence which differed widely from the testimony of the witnesses for the appellant or which may be said to have affected the weight and credibility of the appellant's evidence, or which justified a serious doubt or disbelief with respect to the justice of the claim. Furthermore, the record evidence indicates that no inequitable consequences of any character would develop from the allowance of the appellant's claim. Herein the record presents an instance wherein an appellate court might be well justified in holding that the action of the trial court was arbitrary and capricious. But there exists the possibility that the trial court misconstrued the extent to which the law relative to clear and convincing testimony as to the definite terms of the contract must control the decision of the trial court. And in the case there is the apparent probability that the trial court did not consider the evidence as to performance as being a circumstance entitled to be considered in arriving at its conclusion.

Our examination of the record as abstracted in this case leads us to the conclusion that the trial court either was in error as to the principles of law to be applied in this case or acted arbitrarily and capriciously in reaching its conclusion. For either reason a new trial must be granted. In reaching such a conclusion, it is unnecessary and we do not see fit to overrule any of our decisions to the effect that ordinarily in cases of this character a trial court's judgment in the nature of a negative finding will not be reversed if the uncontradicted evidence is not clear and convincing to the trial court or is unreliable because of facts and circumstances or because other evidence in the cases may affect the weight and credibility of the same. But in this case, as was stated by Mr. Chief Justice Johnston in the case of *Healer v. Inkman,* 89 Kan. 398, 131 Pac. 611, which involved uncontradicted testimony being ignored:

"On the whole it appears that a fair trial of some of the important issues in the case has not been had. The judgment will, therefore, be reversed and the cause remanded for a new trial." (p. 403.)

The appellee's answers in the present cases raise other issues upon which the trial court did not pass final judgment because of the conclusion reached by such court as to the failure of the appellant to prove any contract or agreement whatever. The defenses alleged may or may not be meritorious. It would be improper and unfair to the appellee for this court to pass upon them in this appeal.

The judgments are reversed and the causes remanded for new trials.