No. 41,680

In the Matter of the Estate of Hattie Reed Duncan, Deceased. (PAUL C. ANDREAE, JR., *Appellant*, v. THE FOURTH NATIONAL BANK IN WICHITA, Executor of the Estate of Hattie Reed Duncan, Deceased, *Appellee* and *Cross-Appellant*.)

(350 P. 2d 1112)

Opinion filed April 9, 1960.

*T. B. Kelley* and *Glen Opie*, of Great Bend, argued the cause, and *Fred L. Conner*, of Great Bend, and *K. W. Pringle*, of Wichita, were with them on the briefs for appellant.

*Emmet A. Blaes* and *Fred Hinkle*, of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel, John W. Brimer* and *Harry L. Hobson*, all of Wichita, were with them on the briefs for appellee and cross-appellant.

The opinion of the court was delivered by

FATZER, J.: This proceeding, in the nature of specific performance, was commenced in the probate court of Sedgwick County, Kansas, to establish and enforce an alleged oral contract between the ap-

pellant petitioner and his deceased aunt, Hattie Reed Duncan, alleged to have been entered into in 1946 by which the petitioner was to have the Northwest ¼, section 8, township 20, range 11, Barton County, Kansas, at her death. The proceeding was transferred to the district court of Sedgwick County for trial pursuant to G. S. 1959 Supp. 59-2402a, where issues were joined by the written defense of the executor. Trial was by the court which rendered judgment for the executor, and the petitioner has appealed. The executor duly perfected a cross-appeal from an order overruling one of its defenses.

The decedent's husband, Otis LeRoy Duncan, died June 7, 1946. Approximately two and a half months after his death the decedent made her last will and testament and named the Fourth National Bank, Wichita, Kansas, as executor of her estate. The decedent died May 9, 1957, and her will was admitted to probate in Sedgwick County on June 18, 1957.

Clause 7 of the will bequeathed $5,000 to the petitioner. The quarter section of the land in controversy was not specifically devised nor was any other real estate devised, but the residuary clause disposed of all of the decedent's property not otherwise specifically devised, to the National Benevolent Association of the Christian Church, a corporation, St. Louis, Missouri.

The decedent left an estate appraised at $261,965.19, which included about 2500 acres comprising eighteen different farms, various mineral rights, and other property. The petitioner lives near Ellinwood, Kansas, where he has engaged in farming for the past 25 years. He resides on the Northeast ¼, section 8, township 20, range 11, Barton County, which he owns and farms; he also leased and farmed the Northwest ¼, section 8, township 20, range 11, the property in controversy, which is adjacent to and directly west of the farm owned by him. The Northwest ¼, section 8, township 20, range 11 was known as the "old Barbara Smart place" and owned by the decedent at her death.

The decedent owned approximately 1,100 acres in Oklahoma; one quarter and an 80 in Barton County; four quarters in Morton County; a quarter near Rolla, Kansas; a farm in Butler County; one in Cowley County, and at least two houses in Wichita.

The petitioner considered the will a breach of the oral contract and in this proceeding alleged that in 1946 following the death of her husband and the making of her will, the decedent made an oral

offer that if he would assist her in her personal and business matters, take her to her various farms in Kansas and Oklahoma, supervise the renting of various farms and look after her farming interests and do business and personal errands for her, during her lifetime, the Northwest ¼, section 8, township 20, range 11 in Barton County would become his property at her death. The petitioner alleged he accepted the offer and at once began performance of his part of the contract; that at the request of the decedent he visited her various farms, interviewed the tenants and became familiar with the rental situation of each farm; that he made numerous trips at her request, some with her and some without her, by automobile and by airplane; that he instructed and arranged with the various tenants as to the manner of farming and crops to be planted; that upon return from those trips he reported to the decedent the acts performed for her; that he made innumerable trips from Ellinwood to her home in Wichita to confer with her, and that he had fully performed all of his part of the oral contract.

The petitioner further alleged that by an instrument in the handwriting of the decedent and folded into and accompanying her will, the decedent affirmed and ratified the oral contract and so arranged her assets that her part of the contract would be fulfilled and the Northwest ¼, section 8, township 20, range 11 would become the property of the petitioner at her death. A copy of the instrument was attached to the petition as Exhibit A, and the petitioner alleged that on June 18, 1957, the probate court of Sedgwick County refused to consider that instrument as a part of the decedent's will so as to devise the property in question to the petitioner. The prayer was that the court decree specific performance of the contract, and further, that in the event the court for any reason was unable to specifically perform the contract, he have and recover the sum of $35,000 as compensation for services rendered to the decedent.

Briefly summarized, the petitioner's evidence disclosed there was a close personal relationship between the petitioner and decedent. Between 1946 and 1957 he made eight or ten trips, some involving a stay of two days, to western Kansas to assist the decedent in looking after her farms, collecting rents and conferring with her tenants. The decedent accompanied him on those trips, except on two occasions. On one trip they discovered someone had farmed a piece of her land for four or five years without her

knowledge. They hired an attorney and petitioner assisted her in obtaining a settlement from the party in the sum of $2,000. Petitioner and decedent made two trips to Oklahoma to view her property and confer with one Simpson Hurst, the decedent's Oklahoma agent. The petitioner made several trips to Winfield in 1946 or 1947 to look after her interests there. He testified she paid his expenses on the trips, however, one trip to western Kansas by airplane was not paid for. In addition to assisting his aunt in inspecting her holdings and managing her Kansas farms he helped her pay her taxes, procure marketing cards, secure supplies, as well as performing many personal errands for her. Also, petitioner made innumerable trips from his home to Wichita, and telephoned her as frequently as once a month. Likewise, the decedent made numerous trips to petitioner's home where he would take her to Ellinwood and Great Bend to conduct her business and visit with friends.

The decedent was meticulous in keeping records in the form of a diary and account books in which she recorded receipts and disbursements pertaining to all her properties, and noted in her diary who visited her and where they went; when she and petitioner made various trips; the time involved; where they stayed; the amount she spent for hotels and meals and the amount she paid petitioner for expenses; what she wrote petitioner and what he wrote her; circumstances of securing her marketing cards; that she paid her share of baling alfalfa hay; what elevator a grain check was from and to which farm it was credited; when petitioner was married and when he and his wife visited her; when they took her to church and to the cemetery; how she went to Ellinwood and what she, the petitioner and others did while she was there. In other words, her diary and account books recorded, so to speak, the events and happenings of her daily life.

Several witnesses reported conversations they had with the decedent and statements she made during the period in question to the effect that petitioner was always doing good work, that she was very pleased with him, and felt toward him as if he were her son; that "whenever she wanted anything it was never too much for Pauley to do"; that she depended upon his judgment and appreciated his help and advice, and that she "leaned on him a lot." There was also evidence that the decedent told several people the petitioner was to have the quarter section in controversy at her death.

Shortly after oil was discovered on the quarter section in controversy and after test wells drilled upon petitioner's quarter were dry, the decedent expressed that it was too bad, but said, "don't feel too bad, Paul (petitioner) is to have this place, this farm." On another occasion, referring to the land in question, she told Mr. Dace, her next door neighbor, that "She thought she was going to give him farm land up there at Ellinwood." On July 17, 1953, decedent wrote in her diary "went to safety deposit box, got Will to read again, might want to make some changes." The petitioner's wife testified that in 1955 when decedent was visiting in their home she advised the decedent the petitioner wanted to buy the quarter section in controversy and the decedent said, "now that would be a foolish, a foolish way to pay for something that would be yours when I am gone."

With respect to the written memorandum which was folded in with the decedent's will, a Miss Long, another neighbor of the decedent, testified that in April, 1956, the decedent invited her to come over and visit on the front porch; that the decedent was holding a small writing tablet and told her she was making out a list of properties that she wanted her nephew to have. The witness did not have her glasses and was unable to read what was on the tablet but testified that the quantity of writing on the written memorandum (Exhibit A) corresponded to her recollection of the quantity of writing on the tablet the deceased had at that time, and that the paper was about the same size and kind as the tablet held by the decedent.

On June 18, 1958, the petitioner filed a petition in the probate court of Sedgwick County to probate the memorandum in the decedent's handwriting (Exhibit A) and sought appointment as administrator c. t. a. The memorandum reads as follows:

"Paul C. Andreae jr. to administer my Estate.

"He to inherit east 80 acres of 8-20-11 and have the privilege to burchas the other 80 west acres. as his administration fees."

As alleged in the petition in this proceeding, the probate court denied the petitioner's request for appointment as administrator c. t. a. and appointed the Fourth National Bank in Wichita executor of the decedent's estate pursuant to her last will and testament.

On May 1, 1959, the trial court, in deciding this controversy, stated:

"The Court is of the opinion that the Petitioner has failed to prove that a contract was entered into between the Petitioner and the deceased wherein

the deceased agreed to convey or devise the quarter section of land involved to the Petitioner herein. Also the Court is of the opinion that the services rendered by the Petitioner to the decedent herein were done as a gratuity without the expectation of pay. Therefore, the Court will deny the petition and render judgment denying the petition and find generally in favor of the Executor. I feel like she had probably at times possibly thought of willing this quarter section to Paul, but she never got around to doing so. It is just unfortunate for Paul, but that is something I cannot do anything about as I see it."

In harmony with that finding, the trial court rendered judgment in favor of the executor. Following the overruling of his motion for a new trial, the petitioner appealed.

While eight specifications of error are made, the petitioner asserts the principal question presented is whether his evidence was sufficient to support a finding as a matter of law that a valid contract existed, the terms of which obligated the decedent to will the land in controversy to the petitioner in return for the performance of personal services he rendered to her and for her benefit.

Cases allowing specific performance to enforce an oral contract to will or devise property to another in consideration of personal or filial services are universally those in which a gross fraud would be suffered if specific performance was denied.

In considering the contention that equity should decree specific performance of the alleged oral contract in the instant case, we are guided by cautionary rules and equitable principles which have developed from innumerable cases of this character. It has been repeatedly held by this court that before one can recover under an alleged oral contract to will or devise property to another, such a contract must be clearly and definitely developed by direct evidence or corroborating testimony, or by circumstances from which the reasonable inference arises that an agreement was made. (*Anderson v. Anderson,* 75 Kan. 117, 88 P. 743, 9 L. R. A. [NS] 229; *Bichel v. Oliver,* 77 Kan. 696, 95 P. 396; *In re Estate of Wert,* 165 Kan. 49, 65, 193 P. 2d 253, and cases cited therein.) As stated in *Dreher v. Brumgardt,* 113 Kan. 321, 214 P. 419, "The contract is the foundation of plaintiff's right to recover." Whenever it is once determined from direct or other evidence, that a valid contract was entered into between the parties, equity may specifically enforce its terms. Whether equity will decree specific performance of an asserted oral contract rests in judicial discretion and depends on the facts and circumstances of the particular case. (*In re Estate of Wert,* supra, and cases cited therein.) In the case of an oral con-

tract asserted as the basis for specific performance of a claim against the property of a decedent, it has been held the contract must be definite, its enforcement equitable, and its performance must be established on the part of the promisee—the performance must be attributable to the alleged contract as distinguished from some other relationship between the parties. (*Anderson v. Anderson,* supra; *Bichel v. Oliver,* supra; *Woltz v. First Trust Co.,* 135 Kan. 253, 9 P. 2d 665; *In re Estate of Wert,* supra.) In *Woltz v. First Trust Co.,* supra, cited many times by this court, former Chief Justice Harvey, speaking for the court, said:

"Actions to enforce contracts in effect to devise or bequeath property in consideration for performance of personal or filial services are sufficiently frequent to indicate their popularity, if not their necessity. (69 A. L. R. 16.) Many of them are meritorious. Quite a few of them lack merit. They are a class of cases which call for close scrutiny of evidence, for they offer a great temptation to set up fraudulent claims against the estates of deceased persons. (*Cathcart v. Myers,* 97 Kan. 727, 732, 156 Pac. 751; *James v. Lane,* 103 Kan. 540, 549, 175 Pac. 387.) While in the nature of specific performance, the theory on which the courts proceed is to construe such agreements, if valid in other respects, to bind the property of the testator or intestate so far as to fasten a trust on the property as against the heirs, devisees, or personal representatives of the deceased. (*Anderson v. Anderson,* 75 Kan. 177, 88 Pac. 743; *Braden v. Neal,* 132 Kan. 387, 391, 295 Pac. 678.) In order to sustain his right to recover plaintiff must plead and show that there was a contract and compliance therewith on his part under which, in equity and good conscience, he should possess and enjoy the property sought, as against those who would otherwise be entitled to it. . . ." (l. c. 259.)

In commenting upon the case of *Bichel v. Oliver,* supra, former Chief Justice Harvey said:

"And in the opinion (p. 699) it was made clear in such a case the first question to be determined is whether there was a contract such as is claimed; and, second, is the contract of such an equitable character and so far performed as to be enforceable. . . ." (l. c. 260.)

In the instant case findings of fact and conclusions of law were not requested by either party nor made by the trial court upon its own initiative; hence, all questions must be resolved in favor of the trial court's decision, and it must be presumed that the court considered all necessary evidence to make the general findings and enter judgment thereon. It has been held that a general finding made by a trial court determines every controverted question of fact in support of which evidence has been introduced, and that a general finding by a trial court raises a presumption that it found all facts necessary to sustain and support the judgment. (*Dryden v.*

*Rogers,* 181 Kan. 154, 157, 309 P. 2d 409; *Manville v. Gronniger,* 182 Kan. 572, 577, 322 P. 2d 789; *Redman v. Mutual Benefit Health & Accident Ass'n,* 183 Kan. 449, 457, 327 P. 2d 854.)

The petitioner contends the instant case is one of those fairly rare instances in which there was no substantial evidence to uphold the trial court's finding that he failed to prove the contract was entered into between himself and the decedent. We do not agree. It would serve no useful purpose to narrate the evidence at length. While testimony on behalf of the petitioner was undisputed that the decedent held him in high esteem, relied upon his judgment, and appreciated the many, many favors he performed for her, and that she made statements to the effect she was going to give him the land in controversy or that at her death it would be his or that she might want to change her will, nevertheless, there was no direct or corroborated testimony that the parties entered into a contract such as alleged by the petitioner. We think the record discloses sufficient evidence to require us to uphold the trial court's finding that such a contract was not entered into, upon the ground that the circumstances were such as do not indicate a reasonable inference that such a contract was made.

In the first place, petitioner testified that, and decedent's diary and account books indicate, he was paid expenses for all his trips to western Kansas, Oklahoma, and Winfield, except one trip to western Kansas by airplane. Another compelling circumstance for upholding the trial court's findings is that, although the decedent kept detailed records of important events affecting her business transactions and her property, there was no evidence introduced that she ever recorded the alleged contract which the petitioner claims was entered into. The trial court may have concluded that to be a significant and controlling circumstance. We think it was.

The petitioner contends that the memorandum (Exhibit A) confirmed and ratified the alleged oral contract. The contention is not well taken. At most, the memorandum appeared to be an attempt by the decedent to devise the east 80 to the petitioner and appoint him administrator of her estate with the privilege of purchasing the west 80 as payment for his services as administrator. On its face, the memorandum does not confirm an oral contract. While containing none of the essentials of a valid will, its purport is testamentary in character rather than contractual. The decedent undoubtedly had at times thought of and perhaps intended to will

the quarter section to the petitioner but her attempt to do so was clearly ineffective. Had she added a valid codicil to her will or, for that matter, changed her will which she executed in 1946 and devised the quarter section to the petitioner he would have been the lawful owner of the property and this controversy would not have arisen. But, that did not occur, and we cannot say the record does not support the findings of the trial court that a contract as alleged by the petitioner was not entered into. Not having taken the necessary action she intended during her lifetime, that is, to devise the quarter section to the petitioner, the trial court, and this court on appeal, are powerless to change her will after her death.

The petitioner strongly relies upon *In re Estate of Wert,* 165 Kan. 49, 193 P. 2d 253. When analyzed, that case is not helpful to him. We deem it unnecessary to review at length that decision, but suffice it to say the oral contract there was established by three witnesses whose testimony was undisputed, and this court held the trial court was either in error as to the principles of law to be applied, or acted arbitrarily and capricious in reaching its conclusion that the oral contract was not established. A new trial was ordered, and upon rehearing (*In re Estate of Wert,* 166 Kan. 159, 199 P. 2d 793) this court directed the trial court to enter judgment in favor of the claimant. In the Wert case the making of the oral contract was established by clear and convincing evidence which distinguishes it from the instant case since there was no testimony, oral or documentary, to establish the alleged oral contract.

We have examined other cases cited by the petitioner, but find them to be equally distinguishable. In each instance the claimant had some direct evidence to support the agreement itself. In *Johnson v. Lander,* 140 Kan. 329, 36 P. 2d 1006, we had occasion to consider the degree of proof required to support a contract to will real property. In syllabus ¶ 2, it was held:

"In the proof of such a claim, the evidence may be direct or circumstantial. The essential contractual proposition is that under an agreement they were to be compensated, the claimants rendered the services contemplated by the parties, and had not been paid therefor, which is a question of fact to be determined by the court or jury upon competent evidence."

We think the following, as stated in *Nash v. Harrington,* 110 Kan. 636, 205 P. 354, is apropos to the instant case with respect to the evidence developed by petitioner's witnesses that the de-

cedent made remarks and statements in conversations that the quarter section in controversy was to be the petitioner's at her death:

"In the cases where oral contracts for the conveyance of land have been upheld by this court, it will be found that there was evidence tending to prove the primary facts constituting the contract. Once some such evidence was forthcoming, then such testimony as that of the witnesses Casey and Kleinneger, quoted above, would perform the valuable function of reinforcement or corroboration, by showing that the evidence to support the main proposition was true. But the testimony of Casey and Kleinneger (and the other testimony to the same effect) is corroborative of what? Nothing, because of an utter want of the matter of prime importance—some evidence that Johanna and her father made the contract relied on. The evidence to prove the contract need not be direct, but it must, in sum, be established by clear and satisfactory proof. . . ." (l. c. 643, 644.)

We have made an extended examination of this record and, giving the petitioner's evidence the most favorable inference, we cannot say, when considered as a whole, the trial court erred in finding a contract was not established and that the services rendered by the petitioner to the decedent were performed as a gratuity without expectation of additional compensation. In the absence of clear and convincing evidence to show that a contract was entered into between the parties, we are required to affirm the judgment. While petitioner's evidence showed circumstances which, if believed by the trial court, might have justified the reasonable inference that a contract was entered into, they are insufficient in the face of a finding that such was not the case, to require a reversal of the trial court's judgment.

Other points have been briefed and argued by the parties, including the question raised by the executor's cross-appeal, but in view of conclusions just announced, we think it is unnecessary to lengthen this opinion by discussing and deciding them. Relief is denied the petitioner upon the ground his evidence failed to establish the alleged oral contract, and that his services were performed for and on behalf of the decedent as a gratuity. That being the case, insofar as his claim against the decedent's estate is concerned this controversy is terminated, and the executor, upon final settlement, may properly distribute the assets of the decedent's estate in accordance with the terms of her last will and testament.

The judgment is affirmed.