No. 30,628.

CARL WOLTZ and LOUISE WOLTZ, *Appellees*, v. THE FIRST TRUST COMPANY OF WICHITA, Administrator of the Estate of Margaret Schindler, Deceased, and THE STATE OF KANSAS, *Appellants*.

(9 P. 2d 665.)

Opinion filed April 9, 1932.

*Roland Boynton*, attorney-general, *W. C. Ralston*, assistant attorney-general, *L. A. Hasty, Vermilion Harris* and *Martin P. Shearer*, all of Wichita, for the appellants.

*Walter A. Blake, C. L. Kagey, Hal M. Black, Harold L. Blake* and *Earl Blake*, all of Wichita, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action in the nature of specific performance to establish and enforce an alleged oral contract between plaintiffs and one Margaret Schindler, by which plaintiffs were to have her property at her death. The trial court made findings of fact and rendered judgment for plaintiffs, and defendants have appealed.

Margaret Schindler, for many years a resident of the city of Wichita, died March 15, 1930, when eighty-five years of age. She left no will and had no known heirs. At the time of her death she was the owner of real and personal property of the approximate value of $75,000 above liabilities. Normally, property of one who dies intestate and without heirs passes to the state (21 C. J. 848), the procedure for which and its destination are provided by our statutes (R. S. 22-933 to 22-935 and 22-1201 to 22-1206). Plaintiffs contend that the property does not so pass in this instance because of the alleged contract upon which they rely.

Two days after the death of Mrs. Schindler the First Trust Company of Wichita was appointed administrator of her estate, in

which capacity it has continued to act. The attorney-general was advised of the situation and he designated a representative to give attention to the matter and to preserve, as much as possible, the estate for the benefit of the state. Many persons presented claims for a portion or all of the estate, most of which have been determined to be not well founded, although we are advised claims have been allowed, including expenses of administration to the amount of about $19,300. Plaintiffs made no effort to oppose any of these claims or to conserve the estate, and took no action in probate court.

On March 16, 1931, plaintiffs filed this action in the district court, setting forth their claims in two causes of action. The first set up the purported contract and alleged that Mrs. Schindler had agreed to execute a will leaving her property to plaintiffs after making several minor bequests; that she failed to do so, and claiming the entire property. We shall later discuss this cause of action more in detail. The second cause of action made the first a part of it and further alleged plaintiffs performed services called for by such contract and that the same were of the reasonable value of more than $15,000. The prayer was that the plaintiffs be decreed to be the owners of all the property belonging to Mrs. Schindler at the time of her death, and, further, that in the event the court for any reason is unable specifically to perform the contract, that plaintiffs have judgment for the sum of $15,000. Motions to make the petition more definite and certain and to strike out portions thereof and demurrers thereto were overruled. The answer of the First Trust Company contained a general denial, pleaded the three-year statute of limitations, alleged that no definite demand had ever been made against the administrator within one year from the granting of letters of administration, raised the jurisdiction of the district court with respect to the claim of plaintiffs, and with respect to the oral contract specifically pleaded the statute of frauds. The answer of the state of Kansas on the relation of the attorney-general contained a general denial, pleaded the statute of frauds, alleged the claims of plaintiff are not enforceable in equity under the facts alleged for the reason that the services said to have been performed may be measured and compensated in money and plaintiffs therefore have an adequate remedy at law; alleged the contract relied upon is too indefinite to entitle plaintiffs to recover, either at law or in equity; that their allegations show a lack of performance on their part; that the claim of plaintiffs was inequitable in that the estate of Mrs. Schindler was of a value out of all proportion to the value

of the services which the alleged contract contemplated or which were alleged to have been performed; that the two causes of action alleged are inconsistent, the second disclosing that plaintiff's services were compensable in money; pleaded the three-year statute of limitations, and the lack of jurisdiction of the court to establish the claim as one for services. Plaintiffs' reply was a general denial. At the beginning of the trial motions that plaintiffs be required to elect whether they expected to recover for specific performance of their alleged parol contract, or for compensation of services, were denied. The trial court made findings of fact and conclusions of law as follows:

"FINDINGS OF FACT.

"1. Margaret Schindler, a widow eighty-five years of age, died on or about March 15, 1930, leaving no known heirs at law. At the time of her death she owned real and personal property of the approximate value of $75,000 above liabilities.

"2. The plaintiffs, Carl Woltz and Louise Woltz, became acquainted with Margaret Schindler some time prior to 1920. Approximately ten years before Margaret Schindler died she made an oral agreement with the plaintiffs whereby she agreed to leave her property to them in consideration of their taking care of her for the rest of her life. The evidence does not disclose just what it was intended should be done by plaintiffs to perform their part of the agreement, but it does show that from the time their contract was made the conduct of the plaintiffs toward Mrs. Schindler was that of dutiful children towards a parent. Mrs. Schindler referred to them as her "kids" and as her children, and would frequently go to their home, where she would stay for indefinite periods. On some occasions, when she was ill, the plaintiffs cared for her in their own home. The plaintiff, Louise Woltz, on many occasions prepared certain dishes that she knew Mrs. Schindler particularly relished and took them to Mrs. Schindler's home. She also did sewing and fancy needlework for Mrs. Schindler, for which it does not appear that compensation was at the time asked or received.

"3. Mrs. Schindler had a comfortable home of her own, where she spent the greater part of her time. She employed domestic help, other than the plaintiffs, for which service she paid. The plaintiff, Carl Woltz, who is a carpenter by trade, occasionally made some minor repairs about the Schindler home, for which it does not appear he received any compensation.

"4. Mrs. Schindler, on several occasions, stated to others that the plaintiffs had agreed to take care of her and that they were doing a pretty good job of it, from which fact the court concludes that the contract between the parties was performed by the plaintiffs to the satisfaction of Margaret Schindler.

"CONCLUSIONS OF LAW.

"1. The value of plaintiffs' services cannot be adequately measured in money, and under the facts as found it is not inequitable to require performance of the contract.

"2. The plaintiffs are entitled to have their contract with Margaret Schindler specifically enforced."

While appellants argue various points with much detail, broadly speaking their principal contentions may be thus stated: That the purported contract on which plaintiffs relied, as alleged in their petition, was insufficient to establish their right to recover in equity; that the contract alleged was not proved; that the attempt to prove it tended to establish a contract which differed materially from the one alleged, but that the proof of the contract was insufficient on which to predicate the relief sought, and that the purported contract, as found by the court, was insufficient to justify the relief granted. This requires that we analyze more carefully the allegations of the petition, the evidence, and the findings of the court. Summarizing the petition, it alleges that Margaret Schindler was born in Germany and came to this country when about seven years of age; that she later married Oscar Schindler, who died intestate in 1898; that at the time of her death she was the owner of certain real property, which was described, and also owned personal property consisting of cash, stock, bonds, and other chattels; that plaintiffs, who were of German descent, became acquainted with her about 1908; that they and Mrs. Schindler became warm friends; she visited plaintiffs frequently, sometimes staying several days, and referred to them as her children; "that in August, 1921, said Margaret Schindler came to the home of plaintiffs and told them that they would have to take care of her the rest of her days and that they would be well paid for whatever they did for her, and that she stated to plaintiffs and then and thereafter orally agreed that she would execute her will, and after making several minor bequests, would give, bequeath and devise to plaintiffs the residue of her property"; that plaintiffs thereafter fixed a room in their home for the use of Mrs. Schindler and maintained the same for her, at her request, and she spent quite a little of her time there, taking her meals with plaintiffs and making plaintiffs' home her home. This extended over a period of about three years, beginning in 1926; that plaintiffs, at her request, cared for her when she was ill; that from 1926 to 1929 Mrs. Schindler lived at her home on North Emporia avenue; plaintiffs frequently cooked foods of the kind she relished and took them to her home for her; that in June, 1929, Mrs. Schindler remained with plaintiffs in their home for some time, and in January, 1930, became ill while at the home of plaintiffs and was taken from there to the hospital,

where she remained until her death; that since 1921 plaintiffs looked after Mrs. Schindler much as though she were their own mother, frequently called at her home, or she at their's, and at all times watched and cared for her; that during that time plaintiffs were requested to make repairs and do odd jobs about the home of Mrs. Schindler, which were performed and no charge made therefor; that plaintiffs performed the services aforesaid for Mrs. Schindler under the verbal promise and agreement, previously mentioned, and did all things agreed to be done under the oral promise; that Mrs. Schindler stated to plaintiffs and others that she had executed her will in which she left the residue of her property to them after making several minor bequests, but that the will, if executed, has never been found.

But one witness testified directly as to a contract between plaintiffs and Mrs. Schindler. This was a servant, employed at times in the home of Mrs. Schindler. She testified that she became acquainted with Mrs. Schindler about July, 1919, and did some work for her about the fall of 1920; that when Mrs. Schindler was at her home she saw her nearly every day; that she was at Mrs. Schindler's home sometime in the fall of 1920 when plaintiffs were there.

"I heard Mrs. Schindler say to them, 'You children want to look after me all the time, because when I am gone everything that is here belongs to you—all with the exception of a few little things I want a few friends to have.' She said that the children had been mighty nice to her all the time and she wanted them to have everything she had. She said 'Carl and Louise.' When she said that to them they said they would do all they could to make her happy."

Later, referring to this same matter, she testified:

"Carl and Louise said they would do their best and they said later, 'We will do just what you ask us to.' Then Mrs. Schindler says, 'Children—kids— if you stick to your promise—your contract—I will stick to mine.'"

The alleged contract, as testified to, differs materially from the one pleaded, not only as to the time when, and the place where made, but in its important elements. Indeed, it is difficult to see that it embodied all the elements essential to a contract. No wonder the trial court felt compelled to find: "The evidence does not disclose just what it was intended should be done by plaintiffs to perform their part of the agreement." Had Mrs. Schindler while she was living brought a suit against plaintiffs to require the specific performance of the contract on their part the court necessarily

would have been at a loss to know what acts of performance were required.

There is some other evidence with reference to this supposed contract from witnesses who heard Mrs. Schindler say something about it. To one witness she said, speaking of plaintiffs, that when she was gone they "would have a nice home if they would be just the children she wanted them to be." In 1927 a witness heard her say to Mrs. Woltz, one of the plaintiffs: "You have agreed to take care of me and you are to be well paid for it." To another witness, in 1924, in speaking of some kindnesses of the plaintiffs, she said: "but some day I am going to see they are well paid." And to another witness, in 1929, she said, with reference to plaintiffs: "They will never regret what they have done for me. They will be well paid for it." To another she referred to plaintiffs as "my kids" and said: "They have promised to take care of me all of my days. They will never regret what they have done for me. They will be well paid for it. Some day he (or they) will get all I have." To another witness, in 1926 or 1927, she said Carl and Louise had promised to take care of her the rest of her life and when she was gone they should have what she had. To another witness, in 1928, she said she "was going to leave the Woltzes well fixed, and she had nobody else to leave it to and she was going to leave them her property for taking care of her." An incident which throws some light on the matter is this: In the spring of 1929 Mrs. Schindler was visiting plaintiffs. Mrs. Woltz, looking at the paper, noticed an advertisement of "a salesgirl wanted." She mentioned that to Mrs. Schindler and said: "I ought to go to work because Carl has been out of work, maybe I could help things along a little bit." Mrs. Schindler replied: "No, Louise, you can't go to work; you promised to take care of me as long as I lived, and I promised to give you my property when I am through." She said: "We made the contract, you keep your part of the agreement and I will keep mine." A similar instance about the same time is testified to by one or two witnesses when Mr. Woltz said, in the presence of Mrs. Schindler, that he would have to look for work, and she told him, no, that he couldn't for he had to stay and take care of her because of their contract. Another time, in July or August, 1929, at Mrs. Schindler's home, when plaintiffs were there, this conversation was testified to:

"Mrs. Schindler: 'I have a pretty nice home here, don't I, Carl?'

"Carl: 'Yes, you do.'

"Mrs. Schindler: 'Do you like it, Carl?'

"Carl: 'There isn't a home in Wichita any better.'

"Mrs. Schindler: 'How would you like to live in it?'

"Carl: 'You know what my answer would be. I think it would be awfully nice.'

"Mrs. Schindler: 'Well, after I am gone you will probably live in it.'"

These instances indicate that as late as 1929 plaintiffs did not appear to know or thoroughly to realize that they had a definite contract by reason of which they were to spend their time looking after Mrs. Schindler and in turn were to have all of her property at her death. There is testimony tending to show that at one time she had made a will, by the terms of which plaintiffs in this action were to some extent beneficiaries. But no will was found after her death, and if she made a will why it was destroyed by her, if it was, is not disclosed by the record.

Actions to enforce contracts in effect to devise or bequeath property in consideration of performance of personal or filial services are sufficiently frequent to indicate their popularity, if not their necessity. (69 A. L. R. 16.) Many of them are meritorious. Quite a few of them lack merit. They are a class of cases which call for close scrutiny of evidence, for they offer a great temptation to set up fraudulent claims against the estates of deceased persons. (*Cathcart v. Myers*, 97 Kan. 727, 732, 156 Pac. 751; *James v. Lane*, 103 Kan. 540, 549, 175 Pac. 387.) While in the nature of specific performance, the theory on which the courts proceed is to construe such agreements, if valid in other respects, to bind the property of the testator or intestate so far as to fasten a trust on the property as against the heirs, devisees, or personal representatives of the deceased. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743; *Braden v. Neal*, 132 Kan. 387, 391, 295 Pac. 678.) In order to sustain his right to recover plaintiff must plead and show that there was a contract and compliance therewith on his part under which, in equity and good conscience, he should possess and enjoy the property sought, as against those who would otherwise be entitled to it. "The contract is the foundation of plaintiff's right to recover." (*Dreher v. Brumgardt*, 113 Kan. 321, 214 Pac. 419.) It is essential that the contract be clearly established, that there has been performance on the part of the promisee, and that the claim is equita-

ble. In *Anderson v. Anderson,* supra, a leading case on the question
in this state, it was held:

"Whether equity will decree the specific performance of a contract rests in
judicial discretion and always depends upon the facts of the particular case.
As a rule, when a definite contract to leave property by will has been clearly
and certainly established, and there has been performance on the part of the
promisee, equity will grant relief, provided the case is free from objection on
account of inadequacy of consideration and there are no circumstances or
conditions which render the claim inequitable." (Syl. ¶ 1.)

And on page 123 it was said:

"When a definite contract to leave property by will has been clearly and
certainly established, and there has been performance on the part of the
promisee, equity will grant relief, provided the case is free from objection on
account of inadequacy of consideration and there are no circumstances or
conditions which render the claim inequitable. This is the general doctrine
adhered to by the courts."

In *Bichel v. Oliver,* 77 Kan. 696, 95 Pac. 396, it was held:

"Before an oral agreement will operate as a transfer of land it must appear
that it is certain and definite in subject matter and purpose and has been
proved by clear and satisfactory proof." (Syl. ¶ 2.)

And in the opinion (p. 699) it was made clear in such a case the
first question to be determined is whether there was a contract such
as is claimed; and, second, is the contract of such an equitable
character and so far performed as to be enforceable. The class of
evidence by which the contract is proved, whether direct or cir-
cumstantial, is not so important, but it must be such "as to raise
a convincing implication that the contract was actually made and
satisfy the court of its terms and performance, and that there would
be no inequity in its enforcement." (Syl. ¶ 3.) The principles an-
nounced in the two cases last cited have been frequently reconsid-
ered, adhered to and applied by this court. In some of the cases
it has been held that the contract relied upon was established by
proof, that its terms were ascertainable, that there had been per-
formance on the part of the promisee, and that its enforcement was
in conformity to principles of equity. (*Wooddell v. Allbrecht,* 80
Kan. 736; *Bless v. Blizzard,* 86 Kan. 230, 120 Pac. 351; *Smith v.
Cameron,* 92 Kan. 652, 141 Pac. 596; *Cathcart v. Myers,* 97 Kan.
727, 156 Pac. 751; *Jacks v. Masterson,* 99 Kan. 89, 160 Pac. 1002;
*Harris v. Morrison,* 100 Kan. 157, 163 Pac. 1062; *Hickox v. John-
ston,* 113 Kan. 99, 213 Pac. 1060; *Braden v. Neal,* 132 Kan. 387, 295
Pac. 678.)

In other cases the court has held that the purported contract re-

lied upon was not so established.  (*Overly v. Angel,* 84 Kan. 259, 113 Pac. 1041; *Stark v. Shields,* 91 Kan. 562, 138 Pac. 414; *Fair v. Nelson,* 96 Kan. 13, 149 Pac. 432; *McKeown v. Carroll,* 102 Kan. 826, 172 Pac. 525; *James v. Lane,* 103 Kan. 540, 175 Pac. 387; *Pantel v. Bower,* 104 Kan. 18, 178 Pac. 241; *Nash v. Harrington,* 110 Kan. 636, 205 Pac. 354; *Dreher v. Brumgardt,* 113 Kan. 321, 214 Pac. 419; *Aiken v. English,* 131 Kan. 226, 289 Pac. 464.)

No good purpose would be served in analyzing each of these cases in detail.  To cite them is deemed sufficient.  Applying the principles above announced and the application made of them by this court in the cases cited, it is clear that the purported contract relied upon in this case is indefinite in its terms, not only with respect to the property covered by the contract, but also with respect to what the promisees were to do under it.  It is not established by convincing proof; indeed, it is clear that as late as 1929 its existence and its terms were not clear or understood by the alleged promisees, even if, indeed, they were by the promisor.

The necessary result is that plaintiffs' action fails.  Another reason which requires the same result is that the purported contract necessarily involved the transfer of title to real property.  To be enforceable under the statute of frauds (R. S. 33-106) it was necessary that it be in writing, unless there had been such performance on the part of the promisees as to take the case out of the statute of frauds.  Here there was no way to measure performance by the promisees because it cannot be told from the purported contract what they were obligated to do; hence proof of performance to take the case out from under the statute of frauds is lacking.

There is still another reason which requires the same result.  It is clear from the evidence in this case that all of the services shown by plaintiffs to have been performed for Mrs. Schindler could be readily ascertained and compensated in money.  There is no showing that the parties changed in any substantial degree their mode of living after the time it is alleged this purported contract was made.  Mrs. Schindler continued to live in her home on Emporia avenue.  Plaintiffs continued their residence at a distant part of the city.  They visited back and forth, as they had done previously, and as Mrs. Schindler and other of her neighbors did.  Mrs. Schindler employed her own help at the home, not only in the house, but to take care of her yard and to look after her business property.  It was in the testimony that she was careful not to let anyone do work for her

unless he were hired and paid. On one or two occasions Mr. Woltz, who was a carpenter by trade, did a little work about her premises, on the screens, or made light repairs. Mrs. Woltz did some sewing for Mrs. Schindler. Whether plaintiffs were paid for these services is not specifically disclosed. They are comparatively trivial in any event. Sometimes when Mrs. Schindler visited the plaintiffs she stayed all night, or for a few days, as did others of plaintiffs' friends who visited them. Mrs. Schindler took most of her meals at her home. She obtained cooked foods from time to time from a number of her friends, including plaintiffs. In 1921 she was ill, but was cared for at a hospital, where she was operated upon for tumor. In 1928 she was a patient in a hospital for about three months. For about six weeks prior to her death she was ill and was taken care of at a hospital. For three or four weeks before she was taken to the hospital the last time, she was ill at the home of plaintiffs and was cared for by them. Two doctors attended her during that time. Plaintiffs brought out from these physicians that a reasonable charge for the care given Mrs. Schindler by plaintiffs during that time was from $150 to $200 per month. Whether they were paid for that does not appear from the record, but if not, it was the only service of consequence shown by the evidence to have been performed by plaintiffs for Mrs. Schindler aside from the courtesies and civilities exchanged between neighbors and friends; so there would have been no serious difficulty in establishing the money value of services performed by plaintiffs. A proceeding to recover for such services should have been brought in the probate court. (R. S. 22-708.)

It would be clearly inequitable, as against anyone who had a rightful claim to it, for the court to turn over to plaintiffs property of the reasonable value of $75,000, as found by the court, in payment of services which could be readily estimated in money and which actually amounted to only a few hundred dollars, and which plaintiffs, even when expressing exaggerated views in their petition, did not feel justified in claiming to exceed $15,000.

Taken as a whole, the record clearly shows that the claim of plaintiffs for all of Mrs. Schindler's property by reason of the alleged contract is not well founded and that it has no merits in equity.

The judgment of the court below is reversed, with directions to enter judgment for defendant.