No. 41,181

In the Matter of the Estate of Florence Dull, Deceased. MARTIN HALFMANN and MARTHA HALFMANN, *Appellees,* v. AUBREY EARHART, Executor; MARTHA SCHEUMAN, CLAUDE MORRIS and THELMA HAWKS, Devisees, *Appellants.*

(336 P. 2d 435)

Opinion filed March 7, 1959.

*John R. Alden,* of Hutchinson, argued the cause, and *Aubrey Earhart* and *B. A. Earhart,* both of Hutchinson, were with him on the briefs for the appellants.

*Ralph J. Thorne,* of Hutchinson, argued the cause, and *Charles E. Rauh* and *John A. Robinson,* both of Hutchinson, were with him on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This was an action in the nature of specific performance to establish and enforce an alleged oral contract between appellees Martin and Martha Halfmann, and Florence Dull, deceased, whereby decedent agreed to will them her farm in consideration of their continued care and services for the remainder of her lifetime. On the issues joined, the trial court found a contract had been so made, and ordered specific performance thereof. From a judgment rendered in accordance therewith, Aubrey Earhart, executor of the estate of Florence Dull, deceased, and the devisees of decedent's last will and testament, made only a few months before her death, appeal.

In the interests of brevity, the story of this litigation may best be related by incorporating the trial court's well-written findings of fact and conclusions of law, upon which its judgment was based.

"FINDINGS OF FACT

"1. The petitioners, Martin and Martha Halfmann, were married in the spring of 1930, and shortly thereafter leased from Henry Dull certain land, including the following described farm which is involved in this action:

[description]

and said petitioners continued to rent and occupy said farm until Henry's death, during which period of time they supplied the Dulls with wood and produce from the farm, and performed certain work about the Dull residence and filling station at Yaggy, Kansas, for which they were paid by Mr. Dull.

"2. After Henry Dull's death in 1934, the Halfmanns continued to rent the farm from Florence Dull, Henry's widow, on the same terms as before and they have continuously leased said farm and occupied it as their home from 1930 until the present time.

"3. For several years after her husband's death Florence Dull lived at Yaggy, where for some six or seven months the claimants took fuel, wood and farm produce as before and were paid for the same; that thereafter and during the remainder of Florence's life the Halfmanns continued to supply her with produce and food in substantial amounts, both while she lived at Yaggy and at Hutchinson and were never compensated for any of it; that while she lived at Yaggy, Florence Dull would frequently summon the Halfmanns to her home, where they performed divers and numerous services

in caring for her and keeping up her home and yard and in operating the service station, all without compensation.

"4. In the fall of 1943, Mrs. Dull changed her residence from Yaggy to a home on Garfield Street in Hutchinson, and Martin Halfmann moved her at his own expense; that Martin also made improvements of major character to the Garfield Street house and premises and throughout Mrs. Dull's occupancy spent considerable working time on and about the house, outbuildings, well and yard.

"5. That the relationship between the Halfmanns and Mrs. Dull, who had no children, increased in intimacy throughout the years to within a few months of the date of her death, reaching, or at least approximating, that of parent and child; that claimants visited Florence Dull on frequent and regular occasions both at Yaggy and at Hutchinson, for many years taking their entire family to her house practically every Saturday afternoon where they would all have dinner together, which was prepared by Martha and would then spend the entire evening visiting and playing cards with Florence; that, in turn, Mrs. Dull often visited the Halfmanns at the farm, remaining many times for meals and overnight, and, less frequently, for longer periods of time extending up to several weeks; that the Halfmanns also took Mrs. Dull on vacation and pleasure trips, where expenses were shared in various ways, and on out-of-town trips to doctors and hospitals at their own expense.

"6. Prior to the death of Henry Dull, Martin Halfmann had placed a few rather minor improvements on the quarter section leased by him, for which he was paid by Mr. Dull; that after the latter's death, Martin continued to make comparatively minor improvements to the farm until 1940, in which year Florence Dull promised to, and did, execute a will, leaving the Halfmanns the sum of $2,000.00; that thereafter, and particularly subsequent to 1944, Martin Halfmann erected and placed numerous improvements of substantial value on the farm premises, which materially increased the farm's worth; that Martin Halfmann was never paid anything by Florence Dull for any of the improvements which he placed on the farm or for any of the material or labor, including his own, which went in them.

"7. In the fall of 1944, the decedent, Florence Dull, made an oral agreement and contract with Martin and Martha Halfmann, that if they, the Halfmanns, would continue to care for and look after her in the future as they had in the past, she would will them the farm described in Finding 1, above; that subsequently, and on about October 27, 1944, Mrs. Dull did execute a will, in which she devised the said farm to Martin Halfmann and Martha Halfmann, and gave a copy of this will to the Halfmanns who kept such copy until August, 1955.

"8. That Mr. and Mrs. Halfmann performed their part of the agreement above set out by continuing to care for Mrs. Dull and performing services for her; that they continued to bring her farm produce and food practically every week and sometimes oftener and continued to visit Mrs. Dull, and she them, as set out in Finding 5, above; that they cared for her when sick and took her to and from various doctors and hospitals; that Martha Halfmann, on numerous occasions, did the decedent's laundry and cleaned her house, while Martin did yard work, cared for the dog and kept the premises in repair

and good order; that the Halfmanns were at the beck and call of Florence Dull day and night, and would respond wherever they were; that many calls were made to, and upon, Martin Halfmann while he was employed on different jobs and on such occasions he would leave his work, sustaining considerable loss of wages; that all these services continued to August, 1955, when Mrs. Dull refused to accept them further, although the Halfmanns were willing, and desired, and did endeavor to continue the same, but were prevented from doing so by Mrs. Dull and various other parties.

"9.  That except during a period of from six to seven months after her husband's death, Florence Dull at no time paid either of the petitioners for any of the food, farm produce or other products, items or materials furnished by them, or for any services rendered by them or for any time spent by them in her behalf; nor did Mrs. Dull ever reimburse either Martin or Martha Halfmann for, or participate in the payment of, any of their expenses incurred on her behalf, except in connection with vacation or pleasure trips on which she accompanied them.

"10.  In reliance upon the agreement made between themselves and Mrs. Dull, the Halfmanns, at their own expense, made substantial improvements upon the farm, which have become a part of, and have materially increased the value of the farmstead.

"11.  That due to unfavorable weather, the 1955 crops from the farm were negligible and Mrs. Dull was very disappointed at the small returns she received therefrom; that she became dissatisfied with Mr. Halfmann largely as a result of her reduced farm income, and even accused him of failing to account to her for the landlord's share of the crops; that in August Florence Dull requested and obtained from the Halfmanns the copy of her 1944 will and thereafter and about September 7, 1955, executed another will in which she bequeathed $5,000.00 to the Halfmanns but did not devise the farm to them, thus failing to fulfill her part of the agreement she had made with the Halfmanns.

"12.  That the contract between the petitioners and decedent was not oppressive or unfairly made, but that its terms and provisions are fair, just and equitable and that the same should be enforced.

"13.  That petitioners have been in possession of the farm ever since the death of Florence Dull and have turned over to the executor of her estate certain rents and profits under agreement between the parties, and that the executor should account to claimants therefor."

"CONCLUSIONS OF LAW

"1.  That petitioners, Martin Halfmann and Martha Halfmann, are entitled to the specific enforcement of their contract with the decedent, Florence Dull.

"2.  That petitioners are entitled to the possession of, and entitled to be adjudged the owners of, the following described real estate:

[description]

"3.  That said real estate constitutes no part of Florence Dull's estate passing under her will, but that it belongs to the petitioners by virtue of and in accordance with the provisions of their contract, and that Thelma Hawks, Claude

Morris and Martha Scheuman, devisees named in decedent's will, have no right, title or interest in said real estate.

"4. That Aubrey Earhart, executor of the last will and testament of Florence Dull, should account to the petitioners for all the rents and profits from said real estate received by him since decedent's death, being credited, however, with any taxes, interest and other legitimate charges paid by him.

"5. That costs of this action be taxed to the estate of Florence Dull.

"6. That judgment be entered for petitioners in accordance herewith as of January 10, 1958."

Appellants contend the judgment of the trial court should be reversed on the ground that as a matter of law appellees' evidence was insufficient to establish the contract by clear, convincing and satisfactory proof.

It is true that in order to sustain their right of recovery appellees must clearly show the existence of a contract and compliance therewith, which in equity and good conscience they have a right to enforce. The rule relative to clear and convincing evidence in proof of oral contracts similar to the one herein does not extend to the point of requiring that each and all of the provisions of the contract be proved beyond a reasonable doubt.

In a landmark case, *Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743, we held:

"Whether equity will decree the specific performance of a contract rests in judicial discretion and always depends upon the facts of the particular case. As a rule, when a definite contract to leave property by will has been clearly and certainly established, and there has been performance on the part of the promisee, equity will grant relief, provided the case is free from objection on account of inadequacy of consideration and there are no circumstances or conditions which render the claim inequitable."

It is further stated, at page 127, that it is not essential to the intervention of equity that the agreement be established by direct evidence. It may be established by such facts and circumstances as will raise an implication that it was made, and may have reinforcement from the evidence of the conduct of the parties at the time and subsequently.

We again stated in *Bichel v. Oliver,* 77 Kan. 696, 95 Pac. 396:

"If the facts and circumstances brought out in the evidence, including the acts of the parties, are such as to raise a convincing implication that the contract was actually made and satisfy the court of its terms and performance, and that there would be no inequity in its enforcement, it is sufficient."

In *Woltz v. First Trust Co.,* 135 Kan. 253, 260, 9 P. 2d 665, we held:

"The class of evidence by which the contract is proved, whether direct or circumstantial, is not so important, but it must be such 'as to raise a convincing implication that the contract was actually made and satisfy the court of its terms and performance, and that there would be no inequity in its enforcement.' . . . In some of the cases it has been held that the contract relied upon was established by proof, that its terms were ascertainable, that there had been performance on the part of the promisee, and that its enforcement was in conformity to principles of equity. (*Wooddell v. Allbrecht*, 80 Kan. 736, 104 Pac. 559; *Bless v. Blizzard*, 86 Kan. 230, 120 Pac. 351; *Smith v. Cameron*, 92 Kan. 652, 141 Pac. 596; *Cathcart v. Myers*, 97 Kan. 727, 156 Pac. 751; *Jacks v. Masterson*, 99 Kan. 89, 160 Pac. 1002; *Harris v. Morrison*, 100 Kan. 157, 163 Pac. 1062; *Hickox v. Johnston*, 113 Kan. 99, 213 Pac. 1060; *Braden v. Neal*, 132 Kan. 387, 295 Pac. 678.)"

In the case of *In re Estate of Wert*, 165 Kan. 49, 193 P. 2d 253, the aforementioned cases, as well as others of like import, were reviewed, discussed and adhered to. We stated:

"Oral contracts with deceased persons may be proved by direct evidence or by corroborating testimony in the nature of admissions or statements to third parties, facts, circumstances or conduct consistent with the making of the contracts, performance attributable to the contractual relationship, the failure to. compensate otherwise for performance and by any other competent evidence which may create a convincing implication that a reasonably certain contract was made which, with equity, may be enforced."

From a review of the cited cases and of many others, it appears this court, in cases similar in character to this one, has recognized the rule that the express terms of the contract need not be established by direct evidence, that all the facts and circumstances may be considered, and that performance is not only essential to recovery but is one of the circumstances which should be taken into consideration in determining whether a contract was entered into.

In the instant case, the evidence to support the trial court's findings and judgment leaves no room for doubt. Conceding that such evidence must be clear, satisfactory and convincing, there is no reason or excuse for ignoring all the evidence in the case, much of which comes from disinterested persons. If the evidence in this case is to be disregarded, then equitable principles might as well be abolished.

No useful purpose would be gained by narrating the testimony of the many witnesses. Suffice it to say, in the latter part of 1944, Mrs. Dull became ill with pneumonia and stayed at the farm with the Halfmanns for three weeks, at which time Mrs. Dull stated that she was very grateful for the Halfmanns' care of her; that they had treated her better than if she had been their mother and

the only way she could repay them was by giving them the farm. Joan Halfmann DiNitto testified there was an understanding between the Halfmanns and Mrs. Dull that if they would do as they had always done and would continue to take care of her as they had in the past, she would give them the farm.

On October 27, 1944, Mrs. Dull executed her will, by the terms of which she devised the farm in question to the Halfmanns, and delivered a copy thereof to them, which they placed in the family Bible, where it remained until late in 1955. Subsequent to the delivery of a copy of the will and in reliance upon the contract as confirmed by the will, the Halfmanns made extensive and valuable improvements on the farm which were in excess of $4,000. During the period from the delivery of a copy of the will in 1944 until shortly before the death of Mrs. Dull in December, 1955, at the age of eighty-six, both the Halfmanns and Mrs. Dull continued to act upon the contract, and each understood the other to be irrevocably bound. Mrs. Dull told disinterested witnesses she had made a will wherein she was leaving the farm to the Halfmanns and the place was theirs when she was gone. She told these witnesses how kind and affectionate the Halfmanns had been and were to her, related all the things they had done for her, and mentioned the improvements they had made on the farm. In the summer of 1955, Mrs. Dull told Joan DiNitto that "the will stands as it is and it always will stand as I have made it."

In *Nelson v. Schoonover,* 89 Kan. 388, 392, 131 Pac. 147, we stated that a will duly executed in pursuance of an agreement based upon a valuable consideration becomes itself, in a sense, an enforceable contract. The testator cannot, by making a later will, escape the obligation confirmed by the first one. The delivery of the will to the beneficiary has been treated as of importance in emphasizing the contractual feature of the transaction.

In view of the above and other testimony disclosed in the record, we are of the opinion that the evidence was sufficiently clear and convincing to support the judgment and findings of the trial court.

Appellants further contend that if an oral contract was made, the appellees breached the contract. The record does not support appellant's contention.

It follows that the judgment of the trial court is affirmed.

It is so ordered.