No. 43,644

In the Matter of the Estate of Martha L. Isom, Deceased. (GEORGE BURROWS, JR., *Appellee*, v. T. A. DUDLEY and FRANK MANTZKE, Co-Administrators of the Estate of Martha L. Isom, Deceased, et al., *Appellants.*)

(394 P. 2d 21)

Opinion filed July 14, 1964.

A. E. Kramer, of Hugoton, argued the cause, and *Bernard E. Nordling,*

of Hugoton, and *L. R. Hannen* and *H. T. Horrell*, both of Burlington, were with him on the brief for the appellants.

*Paul A. Wolf*, of Hugoton, argued the cause, and *J. S. Brollier*, of Hugoton, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by George Burrows, Jr. (appellee), hereinafter referred to as the claimant, asking specific performance of an alleged oral contract to devise real estate. It is based upon a claim that Martha L. Isom had made an oral contract in April, 1960, to devise two quarter sections of land, if Burrows and his family would move to her homestead and take care of her and look after her as long as she lived. Mrs. Isom died on July 4, 1961, without leaving any will, and Burrows commenced this action by filing his petition in the probate court of Stevens County, Kansas. On motion the action was transferred to the district court of Stevens County pursuant to the provisions of G. S. 1961 Supp., 59-2402a and G. S. 1949, 59-2402b.

Upon joinder of issues the matter was tried to the court and judgment was entered for the claimant granting specific performance as to the Northeast Quarter of Section 3, but denying it as to the Southeast Quarter of Section 3. The co-administrators and heirs at law of the decedent, hereinafter referred to as the appellants, have appealed that portion of the judgment granting specific performance relative to the Northeast Quarter of Section 3. No cross appeal has been filed as to the other quarter section of land involved.

The primary question is whether the evidence was sufficient to establish a contract to devise real estate between the decedent and the claimant and performance on the part of the claimant.

The trial court made findings of fact and conclusions of law which were incorporated in its journal entry. The findings of fact summarize all of the material evidence and establish the facts in this case. They are as follows:

"Martha L. Isom died intestate on July 4, 1961. At the time of her death she was a widow 76 years of age and had no children surviving her. Her sole and only heirs at law were a surviving sister and numerous nephews and nieces. For many years prior to her death she lived on one of her farms in Stevens County, Kansas, located approximately 12 miles southwest of Hugoton. At the time of her death she was the owner of 9 and one half quarter sections of land several tracts of city real estate and personal property. The total appraised value of her estate was $252,335.92. Decedent's husband, Tom Isom, died January 3, 1959.

"T. C. Langston testified that he did farm labor for Mrs. Isom on an hourly basis during the years 1955, '56 and '57 for which he was paid. During the years '55 and '56, Tom Isom was doing most of the farm work. He took ill in 1957, and T. C. Langston did most of the farm work for that year. In 1958, Tom Isom had recovered his health and T. C. Langston did not perform any farm work for the Isoms. However, during the latter part of 1958, Tom Isom again became ill, was in the hospital, and incapacitated for work and died January 3, 1959. While Tom Isom was in the hospital, T. C. Langston visited him at the hospital in Amarillo, Texas, and in a conversation with Martha L. Isom she said, 'It looks like, Pete, that you're going to have to take over.' Shortly after Tom Isom's death, T. C. 'Pete' Langston had a conversation with Martha L. Isom at her farm at which time she leased to him her farm located in west Stevens County. She further stated that if the Langstons would stay there and take care of her like her children that they would inherit her property. In the conversation it developed that the Langstons were to move a house which belonged to Mrs. Isom from her land in eastern Stevens County in or near her home in western Stevens County and take care of her and that they would benefit greatly by inheriting her place. The Langstons moved the house, and after certain repairs were made, moved in the house. Mr. Langston also moved his TV equipment and other personal property to her round-top barn. In the farming operations Mrs. Isom was to furnish the land and the farm machinery and the Langstons were to furnish labor and fuel. Later, Mrs. Isom told Mr. Langston that she wanted to sell him the equipment and priced the machinery to him. He told Mrs. Isom that her price was out of reason and he made arrangements to buy cheaper equipment. Mrs. Isom would not permit him to use the cheaper equipment and before time to start farming operations for the spring of 1959, the Langstons moved from the Isom farm.

"Emma (Lease) Plaster, a widow at the time, was living in Thermopolis, Wyoming, and in response to a letter written in March, 1959, came to Hugoton in July of 1959, and went out to visit with Mrs. Isom. Mrs. Isom told Mrs. Lease that she wanted her to be a companion to her and help her with everything and to travel with her. Mrs. Isom told Mrs. Lease she would get what she had which would be a plenty and that Mrs. Lease would not have to work any more, and at one time told her that Mrs. Isom would leave her property to Mrs. Lease, which was repeated several times. Mrs. Lease replied that she felt like she should work for what she got.

"Mrs. Lease then returned to Oregon to straighten up her business and in December returned to Stevens County and lived with Mrs. Isom from December 4, 1959, to April 7, 1960. At one time, Mrs. Isom told Mrs. Lease that Mrs. Lease need not work because Mrs. Isom had plenty and she didn't have to worry about anything and no doubt if she lived with her that she would get what Mrs. Isom had. Mrs. Isom further told Mrs. Lease that she didn't want any of her relatives to have any of her property that they didn't need it and that she would like to leave it to somebody that did and that the relatives hadn't done anything for her when she needed them. After a disagreement with Mrs. Isom, Mrs. Lease left the Isom place on April 7th, or 8th, 1960.

"The Petitioner, George Burrows, Jr., in the summer of 1959, farmed milo maize on the northeast Section of 3-34S-39 and the southeast Section of 34-33-39 west on a two-thirds one-third basis. George Burrows, Jr., has continuously since 1959, farmed said land to the present time. Martha L. Isom never had the records in the Stevens County ASC office changed to show he was the tenant on said land. Consequently, during this time George Burrows, Jr., received none of the benefits of the ASC farm program from this land.

"Petitioner's wife, Jewell Burrows, in a conversation held in Mrs. Isom's residence in western Stevens County, testified that Mrs. Isom said to Jewell Burrows, 'I see George has told you of our agreement and you agree.' And Mrs. Burrows answered, 'Yes, I agree, if you think we can get along.' Mrs. Isom answered, 'I see no reason why we can't get along.' Mrs. Burrows asked Mrs. Isom, 'Well, do you think that the children will bother you?' Mrs. Isom replied, 'Oh, no, the kids won't bother me, I love those kids.' At another time, Mrs. Isom told George and I that the relatives weren't allowed on the place and if it took a shot gun for George to keep them off, to keep them off.

"George Burrows purchased a five room shell house approximately 20 feet by 38 feet in dimensions and moved the same to a location on the northeast quarter of Sec. 3-34-39 close to the residence of Mrs. Isom. This was done according to a memorandum agreement dated April 25, 1960, signed by Martha L. Isom and George Burrows, Jr., which provided that said building, and any other buildings moved on the said land by agreement between the parties, may be removed by the second party, Mr. Burrows, at the termination of this rental year or any other year in which this land is farmed and that first party, Mrs. Isom, shall not make any claim for the retention of said building. Said written agreement also provided that George Burrows, Jr., in the removal of said building would remove any foundation or obstruction on the land and would level the ground so that the same would be in its original condition and to the end that the first party Martha L. Isom shall have no expense in connection therewith.

"In a discussion between Mrs. Burrows and Mrs. Isom relative to the locating of the George Burrows' house on the Isom land, Mrs. Isom said she wanted Mrs. Burrows to pick the location because she wanted Mrs. Burrows to be satisfied and happy because Mrs. Burrows was the one that was to live there and added wherever you want to set the house will be just fine with me.

"In April 1960, Mrs. Grace Gillespie of Hugoton, Kansas, who was an acquaintance, in a conversation in an automobile parked on the Main Street of Hugoton, had a conversation with Mrs. Isom. After talking about the weather, Mrs. Gillespie asked Mrs. Isom if she lived by herself now or is Mrs. Spikes' sister with you? Mrs. Isom replied, 'Oh, she hasn't been with me for a long time. I let George Burrows move a house in there by me and I like that better than somebody living with me. He is such a good farmer and so nice to take care of me that when I die, I am going to leave him the home place.'

"Evelyn Brown, who had been acquainted with Mrs. Isom since about 1930, was visiting with Mrs. Isom at her place and in a conversation during the first part of May, 1961, testified that she said to Mrs. Isom, 'Well, if you and Mr. Burrows have any difficulties, will he have to move his home off of your property?' Mrs. Isom replied, 'I don't intend for him to move it off.' Mrs.

Isom further stated to Mrs. Brown that she expected George to live on the place and take care of her and that George was very good to her and she was satisfied with the way he and Mrs. Burrows handled her property and had taken care of her and he will be well paid for it.

"That in June, 1960, the house acquired by petitioner was completed for occupancy and he and his family moved to the Isom homestead where they have since lived and resided; that from that time until the date of decedent's death, petitioner and his wife, besides farming the land as set out above, looked after and cared for decedent in numerous respects, as follows: Took care of her chickens and her yard, got her mail for her on bad days, made repairs and improvements on her house, performed work for her on her rental properties, collected rent for her, prepared and served her meals when she was ill, took her to consult doctors, and treated her as though she were a member of their own family; that for these services petitioner and his wife received no compensation.

"That decedent requested petitioner and his wife to maintain, care for, and not to destroy the lilacs and other shrubbery in her yard after her death. She also requested them to take care of her cemetery lot after her death.

"That during this time the decedent was without the aid and assistance of anyone other than petitioner and his wife."

The written memorandum agreement, to which the trial court made reference, dated the 25th day of April, 1960, by and between Martha L. Isom as first party, and George Burrows, Jr. as second party, in material part reads:

"That WHEREAS, the said Second Party is a tenant from year to year of certain farm ground belonging to First Party and being the NE/4 of Section 3, Township 34, Range 39, Stevens County, Kansas, and other lands; and

"WHEREAS an oral agreement and understanding has been reached about the matters set out herein, it is desired that a written memorandum be made to fix and determine the rights of the parties herein.

"It is agreed by and between the parties that in furtherance of the farming operations of Second Party, it has been agreed between the parties and the Second Party has moved a house entirely owned by him on the NE/4 of Section 3-34-39, being a wooden five-room structure approximately 28 feet by 38 feet in dimensions, and desires the right to remove that building and any other buildings which he may move upon said land in connection with his rights as tenant, and to protect himself as to his right to remove the same.

"IT IS THEREFORE BY THE PARTIES HEREWITH AGREED that this building and any other buildings moved on by agreement between the parties may be removed by Second Party at the termination of this rental year or any other rental year in which this land is farmed, and that First Party shall not make any claim for the retention of said building. It is, however, agreed by Second Party that in the removal of said building that he will remove any foundations or other obstructions on the land and will level said ground so that the same may be in its original condition, and to the end that First Party shall have no expense in connection therewith.

"The consideration of this agreement is the mutual benefits and advantages to be obtained by and between the parties and said parties recognize said mutual rights."

All parties concede and plead this memorandum agreement, and the parties further agree that the written memorandum agreement was made subsequent to the alleged oral agreement to devise the real estate in question. In fact, the appellants concede there is little conflict in the testimony. They contend it is the absence of testimony rather than the question of belief or disbelief of it by the trial court that is presented for review.

It is the appellants' contention that there is no evidence in the record to support the following allegations in the petition:

". . . that in April, 1960, the decedent, desiring to have someone live on her farm and look after and care for her, made an oral offer and proposal to the petitioner that if he and his family would move to her homestead on the NE/4 of Section 3 and would take care of her and look after her as long as she lived that she would devise and will to the petitioner the real estate described above; that, after discussing this offer and proposal with his wife, the petitioner orally accepted said offer and proposal."

Thereupon the appellants review the testimony of the various witnesses set forth in the findings of the trial court item by item, and argue there is no mention of any contract or agreement between the parties as to the time, nature, terms or the existence of any obligation between the parties.

Conclusions of law made by the trial court are as follows:

"(186 K 427) A contract is the foundation upon which the claimant George Burrows, Jr., must base his right to recover. Before one can recover under an alleged oral contract to will, devise or leave property to another, such a contract must be clearly and definitely developed by direct evidence or corroborating testimony, or by circumstances from which the reasonable inference arises that an agreement was made. Such a contract must be definite, its enforcement equitable, and its performance must be established on the part of the promisee—the performance must be attributable to the alleged contract as distinguished from some other relationship between the parties.

"The question before this court is whether the testimony introduced meets these requirements.

"The testimony of the Mr. and Mrs. Langston and Mrs. Lease is material herein only for the purpose of showing the state of mind of Mrs. Isom subsequent to her husband's death.

"This state of mind when considered with the statements of Jewell Burrows, Mrs. Grace Gillespie, Mrs. Evelyn Brown and with the moving of the shell house on the NE¼ 3-34-39, with Mrs. Isom's consent and written contract, is sufficient in this court's opinion to establish the making of the oral contract.

"The evidence is not so clear as to the requirement that the contract be

definite, particularly as to the amount of land Mrs. Isom agreed to leave to the claimant. This court thinks the fact that the Burrows lived in a house they bought and moved on the NE¼ 3-34-39 upon which quarter section of land all of the Isom improvements were located is sufficient to establish said quarter of land as the 'home place,' which land was also farmed by George Burrows.

"There was no evidence to show that Mrs. Isom considered the SE¼ 34-33-39 as a part of the 'homeplace'. The only evidence that would tend to justify George Burrows' claim to this quarter section is the fact that the claimant also farmed it along with the NE 3-34-39. This court does not believe this is sufficient.

"The performance by George Burrows, Jr., although it covered a period of only fifteen months, constituted full performance. There was no long standing family relationship by blood or friendship between George Burrows, Jr., and Mrs. Isom that would account for the performance of the services by claimant.

"The petition of George Burrows, Jr. for specific performance of oral contract to devise real estate is hereby granted as to the NE¼ 3-34-39 and denied as to the SE¼ 34-33-39 Stevens County.

"The proceedings in the Estate of Martha L. Isom, deceased, are hereby remanded to the Probate Court of Stevens County, Kansas, for further administration in compliance with the above orders according to law."

After the trial court made its decision and entered judgment, a motion for a new trial was filed, and, after hearing, was overruled.

We shall first consider a preliminary question raised by the appellants. The appellants contend the "trial court erred in admitting improper testimony of witnesses L. C. Langston, Emma B. Lease, and Lena Frances Langston, as to so called 'similar acts.' "

The appellants contend the testimony of these witnesses was incompetent, concerned unrelated matters, and was not admissible for any purpose. (Citing, *Roberts v. Dixon*, 50 Kan. 436, 31 Pac. 1083; and 20 Am. Jur., Evidence, §§ 246, 248, pp. 239, 242.) The trial court admitted this evidence on the ground it was material only for the purpose of showing the state of mind of the decedent subsequent to her husband's death.

This court has said in *Prymek v. Herink*, 131 Kan. 77, 289 Pac. 412, that other similar acts may be shown when a course of conduct or dealing is in question, or in certain instances when a question of habit or custom is involved.

Dean Slough, in an article entitled "Relevancy Unraveled," 6 Kan. L. Rev. 38, stated:

". . . When evidence of other transactions renders the desired inference more probable than it would be without admission of offered proof, the basic standards of relevancy have been met. . . ." (p. 38.)

A leading case on this point is *Firlotte v. Jessee*, 76 Cal. App. 2d 207, 172 P. 2d 710. The controversy involved an oral agreement be-

tween the parties wherein the defendant sold to the plaintiff for $600 the feed on two hundred acres of land for the 1944 grazing season. The plaintiff went into possession and put some sheep on the leased ground. After eleven days the feed had been topped and the sheep were temporarily removed. Six weeks later the plaintiff discovered that defendant was grazing his cattle on the leased ground and all of the feed was gone. Suit was brought for refund of some of the lease money.

At the trial the plaintiff testified that he had the right to the use of the land for the entire season, exclusive of any interest of the defendant, while the defendant testified that he had reserved the right to pasture his cattle on the land. The testimony of another witness was offered to the effect that the defendant had previously offered the ground to him to pasture for 1944 and had said nothing to him about reserving the right to pasture defendant's cattle on the two hundred acres. The trial court admitted such testimony. On appellate review such ruling was affirmed, the court in its opinion stating:

". . . By reason of the circumstance that defendant's sole defense to plaintiffs' action was a question of fact relating to the claimed reservation by him of a right to use the same land for pasturage of his cattle and the circumstance that defendant also had offered the identical land to witness Frank Faniani without such a reservation, said testimony therefore could reasonably be said to have a direct connection with the question in dispute, and to be essential to its proper determination, as well as affect the credibility of the defendant as a witness. . . ." (p. 211.)

(See, also, *Moody v. Peirano*, 4 Cal. App. 411, 88 Pac. 380.)

In 20 Am. Jur., Evidence, § 248, the rule is stated as follows:

"Evidence of collateral issues may, however, be relevant if the fact which it tends to establish will tend to prove or disapprove the fact in issue, as where it has a natural tendency to corroborate or supplement admitted direct evidence. In other words, while the evidence offered must be confined to, it need not bear directly upon, the issues. But to render evidence of collateral facts competent, there must be some natural, necessary, or logical connection between them and the inference or result which they are designed to establish." (p. 243.)

Wigmore, in speaking of evidence to prove a contract, says:

"It has already been pointed out . . . that it is often difficult to say whether the idea of Habit or that of Plan or System is the more appropriate in evidencing a course of conduct in making contracts. This, however, is after all chiefly a question of words, for the underlying notion and the applicable principle are the same in each case. That principle is . . . (*a*)

that the instances must be numerous enough, and (*b*) that they must have occurred under conditions so similar as to indicate a system, plan, or habit of doing that particular thing under similar circumstances." (2 Wigmore on Evidence [3rd Ed.] § 377, p. 307.)

The California court in *Bone v. Hayes*, 154 Cal. 759, 99 Pac. 172, citing the above section of Wigmore said:

". . . While, ordinarily, evidence that a certain contract was made with A, is not admissible to show that a similar contract was made with B, it has repeatedly been held that such evidence may, in the discretion of the court, be allowed, where the circumstances indicate a strong probability that the course followed in one instance would be followed in others. . . ." (p. 767.)

Under the foregoing rules we hold evidence of Mrs. Isom's prior dealings with the Langstons and with Emma B. Lease was relevant and thus admissible. Such evidence made the inference, that an oral contract was entered into between Mrs. Isom and George Burrows, more probable than it would be without the admission of such transactions. The trial court was well within its discretionary power to accept such evidence at the trial and give it such probative value in proof of the making of an oral contract to devise real estate as it felt the evidence warranted.

As a general rule direct evidence of oral contracts to devise real estate is unavailable because the decedent's lips are sealed by death, and the one who personally entered into the transaction with a deceased person has his lips sealed by the statute. (G. S. 1949, 60-2804.) The law in Kansas has recognized this fact.

In *Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743, the appellants' contention was similar to the appellants' contention here. The court there held that a decree of specific performance can be rendered if the contract is established by such facts and circumstances as will raise an implication that it was made, and may have reinforcement from the evidence of the conduct of the parties, at the time of making the contract and subsequently.

It was held in *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396:

"If the facts and circumstances brought out in the evidence, including the acts of the parties, are such as to raise a convincing implication that the contract was actually made and satisfy the court of its terms and performance, and that there would be no inequity in its enforcement, it is sufficient." (Syl. ¶ 3.)

Another statement of the rule is found in the case of *In re Estate of Wert*, 165 Kan. 49, 193 P. 2d 253, as follows:

"Oral contracts with deceased persons may be proved by direct evidence or by corroborating testimony in the nature of admissions or statements to third parties, facts, circumstances or conduct consistent with the making of the contracts, performance attributable to the contractual relationship, the failure to compensate otherwise for performance and by any other competent evidence which may create a convincing implication that a reasonably certain contract was made which, with equity, may be enforced." (Syl. ¶ 4.)

One of the more recent cases on the subject is *In re Estate of Dull,* 184 Kan. 233, 336 P. 2d 435, where the court stated the rule as follows:

". . . it appears this court, in cases similar in character to this one, has recognized the rule that the express terms of the contract need not be established by direct evidence, that all the facts and circumstances may be considered, and that performance is not only essential to recovery but is one of the circumstances which should be taken into consideration in determining whether a contract was entered into." (p. 238.)

The appellants rely on general law which is discussed in *Andrews v. Aikens,* 44 Ida. 797, 260 Pac. 423, 69 A. L. R. 8; and *Holsz v. Stephen,* 362 Ill. 527, 200 N. E. 601, 106 A. L. R. 737. They also rely on *Woltz v. First Trust Co.,* 135 Kan. 253, 9 P. 2d 665, 106 A. L. R. 748; *Trackwell v. Walker,* 142 Kan. 367, 46 P. 2d 603, 106 A. L. R. 748; *In re Estate of Towne,* 172 Kan. 245, 239 P. 2d 824; and *Brown v. Slusser,* 130 Kan. 834, 288 Pac. 743.

These cases hold that in matters of this character the first question to be determined is whether there was a contract such as is claimed. In *Woltz v. First Trust Co.,* supra, cases where the contract was established are cited, also those where the contract was not established are cited, and the court recognized that no good purpose would be served in analyzing each of these cases. To cite them was deemed sufficient. Each case must be analyzed and stand or fall upon its own facts.

We think the claimant produced sufficient evidence at the trial to raise a convincing implication that an oral contract to devise real estate was made. The decedent was an elderly person, living alone on a farm twelve miles from Hugoton, in ill health, and in need of aid and assistance from someone. From the time claimant and his family moved onto the decedent's farm, they were her only source of aid and assistance. Prior to her contract with the claimant, the decedent had made promises and entered into separate transactions with T. C. Langston and Emma Lease to the effect that if these people would look after her and care for her, she would leave some or all of her property to them. The claimant performed

all of his obligations under the contract, and this performance should be considered as corroborative evidence of the fact that such a contract was in fact made.

The services rendered by the claimant and his wife were not the type of services which a tenant would ordinarily perform for his landlord. Besides farming the land, claimant and his wife looked after and cared for the decedent in numerous respects as found by the trial court. For these and other services the claimant and his wife received no compensation.

The written severance agreement between the claimant and the decedent was the only evidence that the relationship of landlord and tenant existed between the parties. All of the other evidence produced at the trial shows that the decedent never recognized the claimant as an ordinary farm tenant. The evidence shows that the decedent never had the records in the Stevens County ASC office changed to show that the claimant was the tenant on her land. Consequently, during this time, the claimant received none of the benefits of the ASC farm program on this land. If he were a farm tenant, that relationship is not inconsistent with the oral agreement to devise real estate.

The decedent requested the claimant and his wife to maintain, care for and not destroy the lilacs and other shrubbery in her yard after her death. This statement by the decedent shows that she intended for the claimant and his wife to live on this farm after her death. She also requested them to take care of her cemetery lot after her death. This is not a request which a landlord would make of a tenant.

The fact that the claimant purchased a new five-room house and went to the expense of moving it to the homestead of the decedent does not justify the conclusion that the claimant was a mere year to year tenant. It is hardly logical to assume that a year to year tenant would go to such expense where the landlord was quite elderly and whose death would necessitate the removal of the house at additional expense, in the absence of a contract of the kind propounded by the claimant and found to exist by the trial court.

The evidence disclosed that the decedent and her relatives were not on good terms. The relatives were not allowed on the place, and they did nothing for her in recent years. From June, 1960, until her death, the decedent's only aid and assistance came from the claimant and his wife.

There was an abundance of evidence to show that the appellee

had fully performed his obligations under the contract. Full performance by one of the parties to an oral contract is sufficient to take the case out of the statute of frauds.

The facts and circumstances brought out in the evidence—statements and admissions made by the decedent to third parties coupled with other evidence adduced in the case, including the acts of the parties—were sufficient to raise a convincing implication that the contract was actually made and to satisfy the court of its terms and performance. Nothing in the record indicates that enforcement of the contract would be inequitable. The terms of the contract to devise the real estate, described in the evidence as the home place, to the claimant were reasonably certain.

The variance between the petition which sought two quarter sections of land and the finding by the trial court, that the home place consisted of only one quarter section where the buildings were located, is of no consequence on the facts in this case. On the evidence the land in question was the *home place.* What land this included was a matter for the trial court to determine from the evidence. Whether the trial court was correct in such finding is a matter which has not been challenged by the claimant.

The written severance agreement (memorandum agreement) between the decedent and the claimant did not prevent the claimant from proving the existence of a collateral oral agreement which is enforceable. Here the claimant was farming some of the decedent's land under an oral year to year tenancy. When the decedent proposed that the claimant and his family move to the farm so that the claimant and his wife could look after and care for her, it became necessary for the claimant to provide a place on the farm for his family to live. He purchased a new five-room shell house, paid for the foundation, plumbing, heating, wiring, etc., and paid for having it moved to the farm. In the absence of a written severance agreement this house would have become a part of the decedent's real estate. Even though the claimant was to acquire this land by devise from the decedent, by agreement it was necessary that he and his wife look after and care for the decedent during the remainder of her life. If, for some reason, the claimant failed to perform his obligation under the contract and the decedent terminated the contract and his tenancy, the claimant would lose his investment in the house. Consequently, the severance agreement was necessary to protect the claimant, and it related only to the year to year farm

tenancy and the claimant's right to remove his property if the oral contract was not performed by him. The severance agreement itself states: "An oral agreement and understanding has been reached about the matters set out herein," but nowhere does it state that it covers all of the oral agreements between the parties.

A similar situation was presented in the case of *In re Estate of Boller*, 173 Kan. 30, 244 P. 2d 678. There the executor contended the claimant could not recover on an alleged oral agreement because the parties had executed a written contract into which were merged all prior negotiations. The court said:

"We recognize the general rule contended for, but there are exceptions to it, and among them is one that the parol evidence rule does not preclude the admission of extrinsic evidence of a valid prior parol agreement which is separate both in form and substance from the written contract, although related in a general way to it. If the oral agreement does not vary or contradict the written agreement nor invade the particular field which the latter undertakes to cover, but instead has for its subject a matter the parties might naturally deal with separately, the oral agreement may be enforced. . . ." (p. 37.)

The foregoing rule has subsequently been approved in the cases of *In re Estate of Hupp*, 177 Kan. 202, 277 P. 2d 618; and *In Re Estate of Goff*, 191 Kan. 17, 379 P. 2d 225.

In our opinion there was sufficient competent evidence to support the findings of the trial court and the judgment.

The judgment of the lower court is affirmed.